John CLARK, III, Individually and d/b/a Celtic Constructors, Inc. and Betty Stovall (Kit) Clark, Appellants,

v.

Tom BRES and Jan Bres a/k/a Jan Holzinger, Appellees.

No. 14–05–00482–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 5, 2006.

Rehearing Overruled March 1, 2007.

Shawn Russel Casey, Houston, for appellants.

Billy Shepherd, John David Vogen, Allison Standish Miller, Houston, for appellees.

Panel consists of Justices ANDERSON, EDELMAN, and FROST.

## OPINION

JOHN S. ANDERSON, Justice.

In this appeal, appellants, John Clark, III, Individually and d/b/a Celtic Constructors, Inc. ("Clark") and Betty Stovall (Kit) Clark ("Betty Clark"), seek two different forms of relief. First, Clark seeks reversal of the judgment against him and remand for a new trial on the grounds of improper jury argument. Second, Betty Clark, Clark's trial counsel, seeks to have sanctions levied against her reversed. We affirm.

### Factual and Procedural Background

#### A. The Judgment Against Clark

In August 2001, Clark and appellees, Tom and Jan Bres, entered into a residential construction contract in which Clark, a residential contractor, agreed to remodel and construct an addition to appellees' home in exchange for $250,000.00. The agreement would be amended one time raising the price to $280,000.00. The relationship between Clark and appellees soured to the point that Clark filed suit against appellees. Clark alleged appellees breached the contract by failing to pay him for all work he had completed on their home. Appellees filed an answer and counterclaim alleging breach of contract, theft, fraud, unjust enrichment, and violations of the Deceptive Trade Practices Act ("DTPA"). From the beginning of the litigation, appellees made it clear their case was not a simple breach of construction contract case. Instead, appellees specifically alleged that Clark had repeatedly lied and made misrepresentations to them throughout the course of the project and that he stole approximately $100,000.00 from them.

The parties appeared for trial on May 25, 2004. Prior to voir dire, Clark raised the issue of whether appellees could discuss allegations that Clark is a thief, a liar, a cheat, and a fraud. Appellees' counsel explained to the trial court the case was not simply about shoddy work by Clark, but the appellees' entire case was based on allegations that Clark had defrauded them, lied to them, and had stolen approximately $100,000.00 from them. Following that explanation, Clark raised no further objections, and the trial court denied Clark's motion in limine.

At the beginning of appellees' voir dire, appellees' counsel explained to the venire panel: "The evidence is going to show that this gentleman, John Clark, lied to the Breses, defrauded the Breses, deceived the Breses, breached his agreement with the Breses and essentially stole about $100,000.00 of the Breses' money." The panel was then asked more specific questions concerning these allegations. Clark did not object to any of the comments or to any of the follow-up questions. Also during voir dire, appellees' counsel mentioned that Clark was represented by his mother, Betty Clark. At the end of the voir dire, Betty Clark moved for a mistrial solely on the grounds that she had been identified as being related to Clark. In her motion for mistrial, Clark's counsel did not mention anything about the discussion of Clark being a liar, a thief, a cheat, and a fraud.

As plaintiff, Clark was the first to make an opening statement. In her opening, Betty Clark repeatedly referenced appel-

lees' calling Clark a thief, a liar, a cheat and a fraud. At the beginning of his opening statement, appellees' counsel discussed appellees' theory of the case: "The evidence will show and we will prove that [Clark] lied to the Breses, deceived the Breses, defrauded the Breses, breached his agreement with the Breses, and effectively stole $100,000.00 from the Breses' money." From that beginning, appellees' counsel went on to make numerous references to Clark being a liar, a cheat, a thief, and a fraud throughout his opening statement. Clark did not raise a single objection to any of these statements.

During Clark's presentation of the evidence, Betty Clark called both appellees as well as Clark to testify. With each of these witnesses, Betty Clark elicited testimony concerning appellees' allegations that Clark was a liar, a thief, a cheat, and a fraud. Initially, Ms. Bres testified Clark lied to appellees about his purchase of windows and bricks to be used on appellees' home. Ms. Bres also testified Clark had stolen $100,000.00 from appellees. When Mr. Bres was on the witness stand, Betty Clark asked him if he said Clark had stolen money from appellees and generally called Clark a cheat, a fraud, a liar, and a thief. In addition, while questioning Clark about other, similar litigation he had been involved in with customers, it was Betty Clark who first asked her client about being a liar, a thief, a cheat, and a fraud. Specifically, Betty Clark asked:

Q. When you filed the suit, what usually happens, what do the people that you sue usually do?

A. They start calling me a thief, a liar and a cheat.

. . .

Q. And do all your adversaries always call you a thief, a liar, a cheat and a fraud?

A. I think that is going to be my initials, TLC.

Evidence was presented during trial supporting appellees' allegations that Clark was a liar, a thief, a cheat, and a fraud. This included testimony that, prior to entering into the contract, appellees asked Clark if he had experienced any problems with his customers. In response to that question, Clark represented to appellees that he had not been involved in any disputes with his customers. In reality, as Clark's own testimony revealed, Clark had been involved in multiple lawsuits with his customers with one dispute going to trial just days after he signed the contract with appellees. There was also testimony that Clark told appellees he had purchased bricks and windows to be used in appellees' home and had them stored in a warehouse in north Houston. The reality was Clark had not purchased these materials, and he admitted at trial he did not have a north Houston warehouse. There was also testimony by Clark that, to get approval for a draw worth $38,000.00, Clark represented to appellees and the lending bank that he had $48,000.00 of appellees' money on hand in his construction account, when, in fact, there was a negative balance in that account. Clark also, despite being required to do so by the contract, could not produce a single receipt to show how he had spent the appellees' money. In addition, Clark admitted using the appellees' money, which was supposed to be kept in a construction account and used only to pay for the work on appellees' home, for such things as purchases at Spec's Liquor, buying drinks at icehouses, meals at restaurants, and paying his cellular phone bill. The evidence also demonstrated that appellees paid Clark a net of approximately $170,000.00 while Clark performed only $80,000.00 worth of work on appellees' house. Clark also testified he does not give money back to his custom-

ers. Finally, despite contracting with appellees to complete all of the work on appellees' house for $280,000.00 (after the contract was amended), Clark testified he never intended to complete the appellees' project for the contract price.

As plaintiff, Clark led off the final jury arguments. During her closing argument, Betty Clark repeatedly denied Clark was a thief, a liar, a cheat, and a fraud. She also argued the evidence did not support those accusations. In addition, Betty Clark spent a large amount of her closing argument discussing the jury charge in detail. Betty Clark specifically addressed the appellees' damages questions and told the jury to "put a big zero on the questions that ask you how much the Breses are going to get." Finally, Betty Clark explained to the jury how she thought they should answer Clark's breach of contract, fraud, conversion, and damages questions.

During appellees' closing argument, appellees' counsel, while pointing out the evidence supporting appellees' causes of action, emphasized appellees' accusations that Clark was a thief, a liar, a cheat, and a fraud. In addition, appellees presented the jury with an index of answers to the jury questions. While going through this index of proposed answers, appellees' counsel explained the evidence supporting each suggested answer.

The jury returned a unanimous verdict answering all questions in favor of appellees. The trial court entered a final judgment based on that verdict awarding appellees $140,000.00 in damages, $200,000.00 additional damages, attorney's fees of $225,000.00 for preparation and trial of the case, and additional attorney's fees totaling $55,000.00, in the event of appeals to the court of appeals and Supreme Court of Texas in which appellees prevail. Clark filed a "Motion for Judgment NOV or Alternatively Motion for New Trial," which the trial court denied.

### B. The Sanctions Against Betty Clark

During the course of discovery, Clark deposed Ms. Bres. Mr. Bres was also present at the deposition. During the deposition, Betty Clark asked Ms. Bres a number of times if she had a relationship with another man, Tom. Ms. Bres denied having an intimate or romantic relationship with this gentleman. Subsequently, Betty Clark asked the following:

Q. Would you be surprised to learn that [Tom] had said to a group of people at Woodrow's that he considered you to be a sport f___ because you are so engaged in athletic activities and working out?

After appellees' counsel objected and instructed Ms. Bres not to answer the question, the following exchange took place:

Ms. Clark: I suggest that you relax.

Mr. Shepherd: I'm relaxed.

The Witness: I'm not.

Ms. Clark: I didn't imagine that you would be.

Prior to the start of trial, the trial court granted a motion in limine excluding any reference to the above line of questioning. In addition, just before opening statements, the trial court informed the parties that it was reserving the right to hold a Rule 215.3 hearing at the conclusion of the trial relative to Betty Clark's deposition questioning of Ms. Bres. On June 3, 2004, the trial court issued and served a show cause order on Betty Clark ordering Betty Clark to show cause why the trial court should not sanction her for discovery abuse pursuant to Rule 215.3 of the Texas Rules of Civil Procedure and for "professional misconduct during the discovery process" pursuant to the trial court's inherent powers. The trial court held the

sanctions hearing on June 16, 2004. During the sanctions hearing, the trial court stated "the hearing that we are having this morning has been convened pursuant to the Court's inherent powers and the Court's powers under the Rules of Civil Procedure." The issues before the trial court included unprofessional conduct and discovery abuse occurring during the deposition of Ms. Bres. When allegations of the unprofessional conduct arose during the hearing, Betty Clark's counsel objected that it exceeded the scope of the notice given to her in the show cause order. In response to Betty Clark's objection, the trial court offered Betty Clark a continuance to prepare her defense for any allegations she did not believe she was prepared to address during the show cause hearing. Betty Clark declined that offer.

On December 15, 2004, the trial court issued its order sanctioning Betty Clark. In that order, the trial court found the line of questioning in the deposition of Ms. Bres was conducted for the purposes of harassment, intimidation of the witness, and unfair tactical advantage and was inconsistent with the conduct required of an officer of the court. In addition, the trial court determined the line of questioning was not reasonably calculated to lead to the discovery of admissible evidence. By way of background to the incident leading to the sanctions and in order to evaluate Betty Clark's conduct and determine the appropriate sanction, the trial court enumerated in its sanctions order some other instances of Betty Clark's obstruction of the discovery process and misconduct during the trial. First, the trial court noted that during Clark's deposition, at Betty Clark's instruction, Clark repeatedly refused to answer questions that were clearly relevant to issues involved in the litigation and were subject to discovery. As a result of Clark's refusal to answer these questions, appellees were forced to file a motion to compel. At the conclusion of the hearing on appellees' motion to compel, the trial court ordered Clark's deposition be resumed and admonished Betty Clark to review the applicable rules regarding proper conduct of counsel at depositions. Despite this warning from the trial court, Betty Clark's conduct did not improve at Clark's second deposition. Once again, Betty Clark instructed Clark not to answer dozens of questions and then she unilaterally terminated the deposition in violation of the trial court's instructions. This led to a hearing on appellees' second motion to compel at which time the trial court sanctioned Clark for obstruction of the discovery process and awarded appellees attorneys' fees. Second, the trial court observed that during the trial of the case, Betty Clark: (1) implied during her closing argument that appellees were responsible for the lack of sound on a significant videotape played to the jury when, in fact, the lack of sound was the direct result of an evidentiary ruling of the trial court; (2) violated the trial court's ruling and instructions *in limine* during an earlier stage of the trial by directly injecting the issue of the income and wealth of appellees into the case in front of the jury when she asked Mr. Bres: "And you make about $50,000 a month?;" and (3) repeatedly argued with the trial court and disrupted the flow of the proceeding.

After reviewing the totality of the circumstances, the trial court stated that Betty Clark had violated the Texas Rules of Civil Procedure, flaunted the Texas Lawyers Creed–A Mandate for Professionalism, and attempted to obstruct the administration of justice through improper conduct and litigation tactics. In the sanctions order, the trial court made findings of fact and conclusions of law and ordered Betty Clark to pay $2,500.00 in sanctions and required her to attend eight hours of

Continuing Legal Education in legal ethics. Under the trial court's sanctions order, Betty Clark was to pay $2,000 to the District Clerk and $500.00 to the District Clerk for deposit into the registry of the court to be distributed to Ms. Bres as reimbursement for a portion of her relevant legal fees and related costs resulting from Betty Clark's misconduct.

#### DISCUSSION

In two issues on appeal, Clark seeks the reversal of the judgment entered against him. In both issues challenging the judgment, Clark argues appellees engaged in incurable jury argument which requires reversal of the judgment and remand for a new trial. In the remaining four issues raised in this appeal, Betty Clark challenges the sanctions levied against her. In challenging the sanctions award, Betty Clark argues the sanctions imposed by the trial court violated her due process rights and improperly punished her for violating the Texas Disciplinary Rules of Professional Conduct.

### I. Should the Judgment Against Clark Be Reversed?

#### A. Was Appellees' Closing Argument Incurable Jury Argument?

■ In his first issue, Clark argues appellees engaged in incurable jury argument when appellees' counsel called Clark a liar, a thief, a cheat, and a fraud during his closing argument. Clark also argues appellees' argument was incurable since it implied Clark and his counsel were engaged in a conspiracy. Clark must argue appellees' arguments are incurable jury argument since he failed to lodge any form of contemporaneous objection to them.

Therefore, the initial question presented in this appeal is whether Clark sustained his burden to prove appellees' closing argument constituted incurable jury argument.

#### 1. Standard of Review

■ Incurable jury argument exists when the argument is so prejudicial or inflammatory that an instruction to the jury to disregard cannot eliminate the harm. *Otis Elevator Co. v. Wood,* 436 S.W.2d 324, 333 (Tex.1968). Therefore, when a jury argument is incurable, no objection is necessary to preserve error.[1] *Clark Equip. Co. v. Pitner,* 923 S.W.2d 117, 125 (Tex.App.-Houston [14th Dist.] 1996, writ denied). In order to show jury argument is incurable, the complainant must prove: (1) an improper argument was made; (2) that was not invited or provoked; (3) that was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial court; and (4) that by its nature, degree, and extent, constituted reversibly harmful error based on an examination of the entire record to determine the argument's probable effect on a material finding. *Id.* How long the argument continued, whether it was repeated or abandoned and whether there was cumulative error are proper inquiries. *Id.* In addition, the complainant must show the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on proper proceedings and evidence. *Id.* There are only rare instances of incurable harm from improper argument. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979).

#### 2. Was Appellees' Argument that Clark was a Liar, a Thief, a Cheat, and a Fraud Incurable Jury Argument?

1. While no contemporaneous objection is required in order to raise incurable jury argument on appeal, a party must include incurable jury argument as a point in a motion for new trial. TEX.R. CIV. P. 324(b)(5). Clark did include incurable jury argument in his motion for new trial, and therefore, preserved this issue for appeal.

A litigant is entitled to have his counsel argue the facts of the case to the jury. *Tex. Sand Co. v. Shield,* 381 S.W.2d 48, 57–58 (Tex.1964). Trial counsel may properly discuss the reasonableness of the evidence as well as the probative effect or lack thereof, of the evidence. *Id.* at 58. This extends only to the facts and issues raised by the evidence admitted under the rulings of the trial court. *Id.* In addition, attorneys may argue reasonable deductions and inferences from the evidence properly before the jury. *Mundy v. Shippers, Inc.,* 783 S.W.2d 743, 745 (Tex.App.-Houston [14th Dist.] 1990, writ denied). Trial counsel should be allowed wide latitude in arguing the evidence and the reasonable inferences from the evidence to the jury. *Anderson v. Vinson Exploration, Inc.,* 832 S.W.2d 657, 667 (Tex.App.-El Paso 1992, writ denied).

Appellees' jury argument referring to Clark as a liar, a cheat, a thief, and a fraud was not error or improper because the argument discussed matters in evidence. Arguing based on evidence in the record is proper and is the purpose of closing argument. *Tex. Sand,* 381 S.W.2d at 58. As an examination of the entire record demonstrates, the evidence admitted at trial was sufficient for the jury to have found that Clark had in fact lied to appellees, stolen appellees' money, cheated, and defrauded appellees. Appellees' repeated use of these terms, which again were supported by the evidence, does not convert it into incurable error. Instead, such hyperbole for emphasis is an accepted technique of oral advocacy and is a part of our legal heritage and language. *Reese,* 584 S.W.2d at 838.

Clark cites *Southwestern Greyhound Lines v. Dickson,* 149 Tex. 599, 236 S.W.2d 115, 118 (1951) to support his argument that using the terms liar, cheat, thief, and fraud during closing argument constitutes incurable argument. However, *Dickson* does not support Clark's position. Initially in *Dickson,* the use of the terms liar, cheat, and fraud was not supported by the evidence. *Dickson* was a personal injury case that did not involve, as this case does, whether the plaintiff lied to, cheated, stole from, and defrauded the defendants. *See id.* at 116–17. In addition, the Texas Supreme Court stated "there is no absolute rule against expressing even a highly unfavorable opinion of an opposing party or witness." *Id.* at 119. The Texas Supreme Court continued: "the salutary right of counsel thus to speak his mind is subject to obvious limits, which excessive language may exceed-either by connoting an idea or fact without support in the record or by its very character as inflammatory." *Id.* In the case at bar, a central issue was whether Clark had lied to, cheated, stolen from, or defrauded appellees; therefore, appellees use of those terms during closing argument does not constitute incurable jury argument. *See Reese,* 584 S.W.2d at 840 (citing *City of Dallas v. Andrews,* 149 Tex. 609, 236 S.W.2d 609, 611–12 (1951)) (finding harmless error in an argument charging a party with fraud when there was no objection and even when there was no support in the evidence for the argument).

The Texas Supreme Court has determined argument that is otherwise excessive or improper is justified by invitation emanating from the opposite side. *Tex. Sand,* 381 S.W.2d at 58. As plaintiff, Clark always led off each stage of the trial. During her opening statement, Betty Clark mentioned the appellees' referring to Clark as a thief, a liar, a cheat, and a fraud numerous times. During Clark's presentation of the evidence, Betty Clark questioned both appellees, as well as Clark himself, about appellees' allegations that Clark was a liar, a thief, a cheat, and a fraud. This testimony culminated with

Clark's admission, in response to a question asked by his own attorney, that his customers called him a thief, liar, cheat, and a fraud so frequently that he thought his initials were going to be TLC. Finally, during her closing argument, Betty Clark repeatedly denied Clark was a thief, liar, cheat, and a fraud and argued the evidence did not support those allegations. Even if appellees' repeated use of the terms liar, cheat, thief, and fraud constituted improper jury argument, which it did not, appellees' use of these terms was invited by Clark's argument and was a proper response to Clark's denial that he was a thief, a liar, a cheat, and a fraud.

### 3. Was Appellees' Argument Discussing Clark's Other Litigation Incurable Jury Argument?

In his first issue on appeal, Clark also argues appellees engaged in incurable jury argument when appellees discussed Clark's litigation with other customers. During the argument, appellees referenced the fact that in most of those lawsuits Clark was represented by Betty Clark, his mother. Clark argues appellees engaged in incurable jury argument when, in Clark's view, they discussed matters outside the record and implied Clark and his counsel were engaged in a conspiracy. Appellees' argument was not improper as it discussed matters within evidence and inferences from that evidence. *Tex. Sand*, 381 S.W.2d at 58. Clark himself, in response to questions from his counsel, testified about his other litigation with his customers. Clark also testified he was not only represented by his mother in this case but in most of his other litigation against customers as well. Arguing a close connection between a party and his attorney, even arguing the existence of a conspiracy between them, is not incurable argument. *Reese*, 584 S.W.2d at 840. Assuming that such argument is not sup-

ported by the evidence and is improper, it is curable argument requiring an objection to preserve error. *Id.* As Clark did not make any kind of objection during appellees' closing argument, he waived any error that might have taken place. *Id.* at 840–41. We overrule Clark's first issue.

### B. Did Appellees Improperly Inform the Jury of the Legal Effect of Their Answers to the Jury Questions?

In his second issue, Clark argues appellees improperly informed the jury of the legal effect of their answers to the jury questions. We disagree.

The rule that prohibits attorneys from informing the jury of the effect of their findings is designed to prevent an appeal to jurors to abandon their duty to answer the questions according to the evidence and instead, to answer them so that a particular result will be reached. *La. & Ark. Ry. Co. v. Capps*, 766 S.W.2d 291, 296 (Tex.App.-Texarkana 1989, writ denied). A litigant must timely object to a jury being told the legal effect of their answers to raise that point on appeal. *Tex. Employers Ins. Assoc. v. Loesch*, 538 S.W.2d 435, 441–42 (Tex.Civ.App.-Waco 1976, writ ref'd n.r.e.). Clark did not register a single objection to appellees' argument addressing the jury charge. Therefore, Clark waived any error that may have taken place. TEX.R.APP. P. 33.1; *Loesch*, 538 S.W.2d at 442.

Even if Clark had preserved this alleged error, the result would be the same. As long as closing arguments are based on the evidence, attorneys may suggest the correct answers to the jury questions. *McDonough Bros., Inc. v. Lewis*, 464 S.W.2d 457, 463 (Tex.Civ.App.-San Antonio 1971, writ ref'd n.r.e.). During his closing argument, appellees' counsel went through the jury questions and urged the jury to answer the questions favorably to

appellees. In each instance, he backed up his discussion with references to specific evidence from the trial supporting his position. Reasonable jurors are aware that counsel for each party will recommend the answers to the jury questions at closing argument to try to enable his client to prevail. *Cavnar v. Quality Control Parking,* 678 S.W.2d 548, 555 (Tex.App.-Houston [14th Dist.] 1984), *rev'd in part on other grounds,* 696 S.W.2d 549 (Tex.1985). As appellees' argument addressing the jury charge was not a plea to the jury to abandon their duty to answer the questions according to the evidence, but instead was a plea to answer the questions in accordance with the evidence, there was no error committed by appellees.

In addition, the jury charge contained twenty-two questions. Each damages question in the charge was predicated on an affirmative answer to the respective liability question. Therefore, if the jury read the questions, the effect of their answers would be clear to an ordinary juror. If jurors, through the exercise of ordinary intelligence, can determine the effect of their answers to the issues, the argument does not constitute reversible error because it does nothing more than tell the jury what it already knew. *Capps,* 766 S.W.2d at 295–96.

Finally, during closing argument, Betty Clark was the first to address the jury. She was the first to go through the jury charge, and she explained to the jury how she believed they should answer the questions. Therefore, assuming appellees' explanation of how the jury should answer the jury questions was improper, which it was not, appellees' counter-argument was invited by Clark's argument. *Tex. Sand,* 381 S.W.2d at 58. We overrule Clark's second issue.

## II. Should the Sanctions Against Betty Clark be Reversed?

### A. Standard of Review

Pursuant to Rule 215.3 of the Texas Rules of Civil Procedure, a trial court may sanction any party who perpetrates discovery abuses. *White v. Bath,* 825 S.W.2d 227, 229 (Tex.App.-Houston [14th Dist.] 1992, writ denied). In addition, a trial court possesses the inherent power to discipline an attorney's behavior through the imposition of sanctions in appropriate cases. *In re Bennett,* 960 S.W.2d 35, 40 (Tex.1997). Even in the absence of an applicable rule or statute, courts have the authority to sanction parties for bad faith abuses if it finds that to do so will aid in the exercise of its jurisdiction, in the administration of justice, and the preservation of its independence and integrity. *Roberts v. Rose,* 37 S.W.3d 31, 33 (Tex.App.-San Antonio 2000, no pet.). The trial court is not limited to considering only the specific violation for which sanctions are finally imposed, but it may consider everything that has occurred during the history of the litigation. *White,* 825 S.W.2d at 230. In the case at bar, pursuant to both Rule 215.3 and its inherent powers, the trial court sanctioned Betty Clark for her conduct during the deposition of Ms. Bres.

The decision to impose a sanction is left to the discretion of the trial court and will be set aside only upon a showing of abuse of discretion. *McWhorter v. Sheller,* 993 S.W.2d 781, 788 (Tex. App.-Houston [14th Dist.] 1999, pet. denied). The trial court is given the broadest discretion in imposing such sanctions and in choosing the appropriate sanctions. *White,* 825 S.W.2d at 229. The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles, or whether under the circumstances of the case, the trial

court's action was arbitrary or unreasonable. *Id.* at 230. In determining whether the trial court abused its discretion, the appellate court must ensure the sanctions were appropriate and just. *Am. Flood Research, Inc. v. Jones,* 192 S.W.3d 581, 583 (Tex.2006) (per curiam). "In reviewing sanctions orders, the appellate courts are not bound by a trial court's findings of fact and conclusions of law; rather, appellate courts must independently review the entire record to determine whether the trial court abused its discretion." *Id.* In addition, the power to sanction is limited by the due process clause of the United States Constitution. *In re Bennett,* 960 S.W.2d at 40. Due process requires that a party be given adequate notice and an opportunity to be heard. *Id.*

**B. Did the Trial Court Give Betty Clark Inadequate Notice of the Complaints Against Her, Thus Violating Her Due Process Rights?**

 In her first issue on appeal, Betty Clark argues she did not receive full notice of the conduct, which the trial court was considering for possible sanctions. Imposing sanctions on a party without notice and an opportunity to be heard would violate the requirements of due process. *Braden v. S. Main Bank,* 837 S.W.2d 733, 738 (Tex.App.-Houston [14th Dist.] 1992, writ denied). Betty Clark cites three out of the ten findings of fact included in the trial court's December 15, 2004 sanctions order in support of her argument her due process rights were violated. Specifically, Betty Clark complains of the trial court's findings that: (1) she significantly interfered with the legitimate exercise of the traditional core functions of the trial court; (2) the sanctions levied against her were necessary to ensure respect for the enforcement of lawful orders of the trial court; and (3) the sanctions are reasonable to enforce the trial court's control over all

court proceedings and to ensure that justice is done without undue delay. In Betty Clark's view, these three findings of fact establish the trial court violated her due process rights by sanctioning her for conduct beyond the scope of the Show Cause Order. We disagree.

 Initially, Betty Clark misconstrues the purpose and effect of findings of fact contained in a discovery sanctions order. If a trial court makes findings of fact to support its discovery sanctions, the findings are not treated like findings pursuant to Rule 296 which involve non-jury trials on the merits. *Jefa Co. v. Mustang Tractor and Equip. Co.,* 868 S.W.2d 905, 910 (Tex.App.-Houston [14th Dist.] 1994, writ denied). The findings of fact are not binding on the reviewing court. *Id.* The purposes of findings of fact to support the imposition of discovery sanctions are to: (1) aid appellate review through a guided analysis; (2) assure judicial deliberation; and (3) enhance the deterrent effect of the sanctions order. *Id.* During appellate review, we make an independent review of the entire record, including the circumstances surrounding the alleged discovery abuse, to determine if the trial court abused its discretion in imposing the sanctions. *Am. Flood Research,* 192 S.W.3d at 583.

Here, the trial court served its Show Cause Order on Betty Clark on June 3, 2004. The Show Cause Order indicated the trial court would address the following issues during the sanctions hearing:

At that time, the court will conduct a hearing pursuant to Rule 215.3 of the Texas Rules of Civil Procedure. The Court ORDERS Ms. Clark to appear at the hearing to show cause why it should not assess sanctions against her for discovery abuse.

The court also has inherent powers to ensure that all proceedings be conducted

with dignity.and in an orderly and expeditious manner. Accordingly, the court ORDERS Ms. Clark to show cause at that time why she should not be sanctioned for professional misconduct during the discovery process.

During the sanctions hearing, the trial court's questions all related to Betty Clark's conduct during the deposition of Ms. Bres. The trial court's sanctions order states:

> The issues relative to the show cause hearing arose in the context of [Betty] Clark's deposition examination of Jan Bres. During that examination, [Betty] Clark, among other things, inquired on several occasions whether Ms. Bres, a married woman, had a romantic relationship with another man. These questions were asked in front of Ms. Bres' husband, who was present at the deposition. [Betty] Clark's inquiries culminated with a question that included obscene language and explicit sexual innuendo. The line of questioning (and particularly the final question), viewed in context, cannot be construed by this Court as reasonably calculated to lead to the discovery of admissible evidence. On the contrary, it is clear that this line of inquiry was conducted for the purpose of harassment, intimidation of the witness, and unfair tactical advantage. [Betty] Clark's conduct was completely inconsistent with that of an officer of the Court.

The foregoing language demonstrates the trial court sanctioned Betty Clark for her conduct during the deposition of Ms. Bres. The findings of fact Betty Clark complains about all pertain to whether she engaged in improper conduct during the discovery process, of which charge she was given full notice. The references in the sanctions order to other conduct by Betty Clark served as background information to show: (1) why a lesser sanction was not a viable

alternative in this case; and (2) the trial court had considered all of the relevant circumstances in the case before sanctioning Betty Clark.

Betty Clark's argument that her due process rights were violated because she was entitled to but did not receive detailed notice equivalent to a criminal indictment is also misguided. There is no requirement for the type of detailed notice demanded by Betty Clark. All due process requires is notice of the trial court's intent to consider imposing sanctions and an opportunity to be heard. *Jefa*, 868 S.W.2d at 910. There is not even a requirement of an oral hearing. *Cire v. Cummings*, 134 S.W.3d 835, 844 (Tex.2004). There is no question Betty Clark was served with the Show Cause Order, appeared at the sanctions hearing, and had an opportunity to address the sanctions issue. In addition, after counsel for appellees argued that Betty Clark's conduct warranted sanctions, Betty Clark's counsel responded by telling the trial court he did not believe the notice found in the Show Cause Order covered all subjects being addressed at the sanctions hearing. In response, the trial court asked if Betty Clark desired a continuance of the hearing in order to prepare to address any subjects she did not believe she was ready to discuss that day. Betty Clark rejected this offer of a continuance three separate times. By passing up the trial court's offer of a continuance in the sanctions hearing, Betty Clark waived any deficiencies that may have existed in the notice she received. *See Negrini v. Beale*, 822 S.W.2d 822, 823–24 (Tex.App.-Houston [14th Dist.] 1992, no writ) (holding a party waived any error that may have existed in summary judgment notice where the party received notice of the hearing, appeared at it, and did not ask for a continuance).

After an independent review of the entire record, we conclude Betty Clark was

given adequate notice of the trial court's intention to consider sanctions and was given an opportunity to respond. Due process was not violated in this case. *See In re Bennett*, 960 S.W.2d at 40. We overrule Betty Clark's first issue.

**C. Did the Trial Court Exceed Its Authority to Sanction When It Referenced the Texas Disciplinary Rules of Professional Conduct in Its Sanctions Order?**

■ In her second issue, Betty Clark argues the trial court's sanctions order usurped the exclusive function of the State Bar of Texas grievance procedure by referencing the Texas Disciplinary Rules of Professional Conduct and thereby violated her due process rights.

As discussed above, the trial court sanctioned Betty Clark for her inappropriate conduct during the deposition of Ms. Bres. Rule 215.3 of the Texas Rules of Civil Procedure specifically allows sanctions to be entered against a party for abusing the discovery process in seeking, making, or resisting discovery. TEX.R. CIV. P. 215.3. Texas courts also possess the inherent power to discipline an attorney's behavior. *In re Bennett*, 960 S.W.2d at 40. A court may call upon this power to aid in the exercise of its jurisdiction, in the administration of justice, and in the preservation of its independence and integrity. *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex.1979). When considering the imposition of sanctions, a trial court is not limited to considering only the specific violation for which sanctions are finally imposed, but it may consider everything that has occurred during the history of the litigation. *White*, 825 S.W.2d at 230.

The only reference in the sanctions order to the Texas Disciplinary Rules of Professional Conduct occurs in the trial court's conclusions of law. As noted above, we are not limited by the trial court's findings of fact and conclusions of law. *Am. Flood Research*, 192 S.W.3d at 583. Instead, we must independently review the entire record of the trial court proceedings to determine whether the trial court abused its discretion in sanctioning Betty Clark. Having made an independent review of the entire record, we conclude the sanctions levied on Betty Clark for her abusive and contumacious conduct during the deposition of Ms. Bres were appropriate and just under Rule 215 and the trial court's inherent powers. Accordingly, the trial court did not abuse its discretion in sanctioning Betty Clark. Even assuming the trial court erred in citing to alleged violations of the Texas Disciplinary Rules of Professional Conduct, this reference did not result in an improper judgment because there were other, proper grounds to support the sanctions order. *See* TEX.R.APP. P. 44.1. We overrule Betty Clark's second issue.

**D. Did the Trial Court Violate Betty Clark's Due Process Rights When It Imposed a $2,500.00 Sanction Without Obtaining Betty Clark's Waiver of a Right to a Jury Trial?**

■ In her third issue, Betty Clark argues that since she was sanctioned $2,500.00, her due process rights were violated because she was entitled to a jury trial. While recognizing the trial court's authority to levy the sanctions pursuant to its inherent power,[2] Betty Clark argues

---

**2.** Although she recognized the trial court's inherent authority to impose the sanctions at issue here, Betty Clark states courts have no authority under Rule 215.3 to assess a monetary fine unrelated to attorney's fees. In Bet-

ty Clark's view, the only sanctions permitted under Rule 215.3 are those specifically referenced in Rule 215.2(b), and therefore, any monetary sanctions must be limited to the attorney's fees incurred by the innocent party.

since the sanctions were for more than $500.00, they constitute a punishment for a serious offense thus entitling her to a jury trial. We disagree.

It is not the law of Texas that any sanction over $500.00 levied by a trial court requires a jury trial. The cases cited by Betty Clark in support of her argument can each be distinguished as none of them address sanctions levied by a trial court for discovery abuse or improper conduct in the discovery process. Instead, each of the cases cited by Betty Clark concern contempt proceedings involving penalties, including imprisonment, far more serious than those at issue here. *See Ex Parte Sproull,* 815 S.W.2d 250, 250 (Tex.1991) (per curiam) (holding in a habeas proceeding that an alleged contemnor, sentenced to twenty-two years' confinement for failure to pay child support, had a constitutional right to a jury trial as he faced a serious charge of criminal contempt; defining a serious charge of criminal contempt as a charge for which the confinement may exceed six months); *Ex Parte Griffin,* 682 S.W.2d 261, 262 (Tex. 1984) (holding in a habeas proceeding that a contempt action in which the contemnor is fined $104,000.00 and ordered to jail for thirty days is a serious offense, and the contemnor was entitled to a jury trial); *Ex Parte McNemee,* 605 S.W.2d 353, 356 (Tex. App.-El Paso 1980, orig. proceeding), *disapproved of on other grounds by Huff v. Huff,* 648 S.W.2d 286 (Tex.1983) (holding

by the court of appeals that, if the punishment for contempt is more than six months, imprisonment constitutes a serious offense and the relator was entitled to a jury trial). Betty Clark's citation of section 21.002 of the Texas Government Code also does not support her argument as it addresses situations where a court order has been violated. *See* TEX. GOV'T CODE ANN. § 21.002 (Vernon 2004). Here, Betty Clark was sanctioned for abusing the discovery process and for improper conduct during the discovery process, not for violating a court order. As Betty Clark was not entitled to a jury trial on the issue of sanctions, we overrule her third issue.

**E. Did the Trial Court Improperly Sanction Betty Clark by Assessing Only One Punishment Covering All of Its Findings?**

Betty Clark's argument that the trial court violated her due process rights by issuing only one order is without merit. In support of this argument, Betty Clark once again cites cases that do not address sanctions levied by a trial court for discovery abuse or improper conduct in the discovery process. Instead, each of the cases cited by Betty Clark concerns contempt proceedings. *See Ex Parte Lee,* 704 S.W.2d 15, 17 (Tex.1986) (holding in a habeas proceeding that if one punishment is assessed for more than one act of contempt, and one of those acts is not punishable by contempt, the entire judgment is

---

We disagree. The Texas Supreme Court has recognized that discovery abuse is widespread, and it has given trial courts broad authority to curb such abuse. *Braden v. Downey,* 811 S.W.2d 922, 930 (Tex.1991). The legitimate purposes of discovery sanctions are threefold: (1) to secure compliance with the discovery rules; (2) to deter other litigants from similar misconduct; and (3) to punish violators. *Butan Valley, N.V. v. Smith,* 921 S.W.2d 822, 827 (Tex.App.-Houston [14th Dist.] 1996, no writ). A trial court is not

limited to the laundry list of specifically authorized sanctions found in Rule 215.2(b). *Braden v. S. Main Bank,* 837 S.W.2d 733, 740 (Tex.App.-Houston [14th Dist.] 1992, writ denied). In this case, a sanction limited to the attorney's fees incurred by Ms. Bres, the innocent party, would have been meaningless since the attorney's fees she incurred as a direct result of Betty Clark's sanctionable conduct were minimal and would not have accomplished any of the purposes for discovery sanctions.

void); *Ex Parte Lillard,* 159 Tex. 18, 314 S.W.2d 800, 806 (1958) (holding in a habeas proceeding that a finding of contempt cannot be based on a void judgment); *Ex Parte Stanford,* 557 S.W.2d 346, 349–50 (Tex.Civ.App.-Houston [1st Dist.] 1977, orig. proceeding) (holding in a habeas proceeding that when one penalty is affixed for more than one act of contempt, and it is determined the relator could not be held in contempt for one of the acts, the whole judgment is void). In addition, the trial court's order sanctioning Betty Clark was directed at a single incident: Betty Clark's conduct during the deposition of Ms. Bres. The references in the sanctions order to other acts by Betty Clark during the litigation were to (1) make clear the trial court had carefully analyzed Betty Clark's conduct, (2) demonstrate the trial court considered all of the relevant circumstances in the case, and (3) illustrate why a lesser sanction was not viable. As we have found the sanctions order did not violate Betty Clark's due process rights, we overrule Betty Clark's fourth issue.

## Conclusion

Having overruled both of Clark's issues on appeal and all of Betty Clark's issues on appeal, we affirm the trial court's Final Judgment and December 15, 2004 Sanctions Order.