**Affirmed and Memorandum Opinion filed February 9, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-10-01121-CR

---

### ELIAS SALINAS, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 178th District Court
Harris County, Texas
Trial Court Cause No. 1168443**

---

## M E M O R A N D U M   O P I N I O N

Appellant Elias Salinas appeals his conviction for the felony offense of murder. After the jury found him guilty, the trial court assessed punishment at 45 years' incarceration in the Institutional Division of the Texas Department of Criminal Justice. In four issues, appellant contends (1) the trial court erred in denying appellant's motion for directed verdict, (2) the evidence is insufficient to support his conviction,

(3) appellant was denied due process by the prosecutor's improper jury argument, and (4) the trial court erred by denying his *Batson*[1] challenge. We affirm.

### *Background*

Appellant lived with the complainant, Monica Carmouche, and her two daughters in a one-bedroom apartment in Pasadena, Texas. One Saturday evening, Monica's 13-year-old daughter, A.C., went to bed about 8:00 p.m. while appellant and Monica were in the apartment.[2] Sometime during the night, Monica came into the bedroom to check on A.C.[3] On Sunday morning, A.C. found Monica lying on the sofa bed in the living room. Monica was dead. Appellant was not in the apartment, but the front door was cracked open. There were no signs of forced entry into the apartment. A.C. had not heard any arguing or scuffling the night before.

Appellant left the apartment and his belongings. A.C. never saw or heard from appellant again. In a statement taken six days after Monica's death, appellant claimed he left the apartment between 9:30 p.m. and 10:00 p.m. Saturday night and drove to Edinburgh, Texas, to see his mother. If appellant had left Pasadena at that time, he would have arrived in Edinburgh around 3:00 a.m. Sunday. Appellant's cell phone records showed that appellant called his mother at 7:41 p.m. Saturday night and 3:00 a.m. Sunday morning. There was no evidence of appellant's location when the calls were made.

Appellant also said he had broken up with Monica that night because of her drug use. Despite this, he did not pack any clothes because he stated he was planning to return to Pasadena the following Friday. Appellant left town without turning in his time sheet or collecting his earnings for working the week preceding Monica's death. Appellant stated he did not return to Pasadena because his uncle spoke with Monica's mother, who

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[2] A.C.'s sister was staying overnight at a friend's house.

[3] A.C. testified at trial she did not know when her mother checked on her, but she previously had told police officers her mother came into her room "in the middle of the night."

told his uncle that Monica had overdosed.[4] Appellant contacted a lawyer, who advised him not to return to his job in Pasadena.

Police officers initially speculated that Monica had died from an overdose or choking on vomit[5]; thus, the apartment was not treated as a homicide scene. The autopsy, however, concluded that Monica's death was caused by asphyxia from manual strangulation.[6] Monica had suffered many injuries caused by a hand compressing her neck, including approximately eleven areas of internal hemorrhages, approximately six cartilage fractures, and external contusions. The cartilage fractures were caused by a significant amount of force applied to Monica's neck. Monica also had petechial (dot-like) hemorrhages in her eyes, on the skin around her eyes, and in the mucus membranes in her mouth, which are associated with death by asphyxia but not with an overdose. She had bruises and scratches on her neck, her forearm, her legs, her shoulder, her arm, her hand, under her jaw, and near her eye. These bruises and scratches were "relatively fresh" with "no evidence of healing."[7] The pattern of bruises and linear scratches on Monica's neck, together with her multiple internal injuries, were characteristic of manual strangulation. Although Monica also had hydrocodone in her system in an amount that could be lethal to some people, the medical examiner opined that hydrocodone did not contribute to Monica's death because she had "all of the signs that she died of a strangulation" and the petechial hemorrhages would not have been as florid if she had somehow survived the manual strangulation and then died of an overdose.[8]

---

[4] Monica's mother testified she never spoke with anyone in appellant's family.

[5] There was a substance found near Monica's body that may have been vomit. The medical examiner testified that gastric contents from the stomach can come into the airways and out of the mouth postmortem.

[6] Asphyxia is a decrease of oxygen to the brain, and manual strangulation is strangulation with hands.

[7] The medical examiner testified that usually some evidence of healing for abrasions appears within 12 hours and some evidence of healing for bruises appears within four to six hours.

[8] Appellant's DNA was found in fingernail scrapings and clippings from Monica's left hand, and appellant's sperm was found in Monica's vagina. DNA from an unknown person was found under the

Monica's friend, Phillip Lynch, and her mother, Brenda Williams, both testified that appellant was jealous and domineering. Before moving to the apartment, appellant, Monica, and her daughters stayed with Lynch for about a month. During that time, appellant would follow Monica "like a shadow," including into the bathroom. Williams testified that appellant "wouldn't let [Monica] go anywhere without him" and would tell her not to put on make-up when she went out. Shortly before Monica died, she seemed "very scared and confused."

### Sufficiency of the Evidence

In his first two issues, appellant argues (1) the trial court erred in denying appellant's motion for directed verdict because the State failed to present sufficient evidence appellant murdered Monica and (2) the evidence is factually insufficient to support the jury's verdict.

We review a challenge to the denial of a motion for directed verdict as a challenge to the legal sufficiency of the evidence. *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996); *see also Bargas v. State*, 252 S.W.3d 876, 886 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Moreover, the legal-sufficiency standard is the only standard that we apply to determine whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality opinion); *Pomier v. State*, 326 S.W.3d 373, 378 (Tex. App.—Houston [14th Dist.] 2010, no pet.). We review the sufficiency of the evidence in this case under the legal sufficiency standard of *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks*, 323 S.W.3d at 906; *Pomier*, 326 S.W.3d at 378. We view all of the evidence in the light most favorable to the verdict to determine whether the fact-finder was rationally justified in finding guilt beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 899. This court does not sit as a thirteenth juror and may not substitute its judgment for that of the fact-finder by re-evaluating the weight and

---

nails of Monica's right hand. A DNA analyst testified that DNA may be deposited around or under one's fingernails by, among other things, general touching or scratching.

credibility of the evidence. *Id.* at 901–02, 905; *see also Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We defer to the fact-finder's resolution of conflicting evidence unless the resolution is not rational. *Brooks*, 323 S.W.3d at 902 n.19, 907; *Pomier*, 326 S.W.3d at 378. Our review includes both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence are treated equally. *Id.*

A person commits murder by (1) intentionally or knowingly causing the death of an individual, (2) intending to cause serious bodily injury and committing an act clearly dangerous to human life that causes the death of an individual, or (3) committing or attempting to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight therefrom, committing or attempting to commit an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code § 19.02(b).

Appellant takes issue with the sufficiency of the evidence to support his conviction on the following grounds:

- No evidence directly linked appellant to the crime;
- The medical examiner testified Monica suffered a violent death, yet A.C. did not hear appellant and Monica scuffling or fighting the night before A.C. discovered her mother had died;
- Appellant purportedly drove to Edinburgh, a six-hour drive, sometime after 9:00 p.m. that Saturday night, but A.C. testified that her mother went in and out of the bedroom during the night to check on her;
- Police did not secure the apartment as a crime scene, and no fingerprints were taken;
- Appellant's DNA found on Monica was unsurprising, as appellant and Monica were in a romantic relationship, and DNA from an unknown individual was found on Monica; and
- Monica had hydrocodone in her system in an amount that might be lethal to some people.

5

## 1.  Evidence Linking Appellant to Monica's Death

Appellant argues the evidence to convict him of murder is insufficient because it did not directly link him to the crime.  However, lack of direct evidence is not dispositive of a defendant's guilt.  *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). Circumstantial evidence is as probative as direct evidence in establishing guilt.  *Id.* Reviewing the evidence presented in this case with the appropriate level of deference to the jury's credibility determinations, we conclude that based on the following evidence the jury was rationally justified in finding beyond a reasonable doubt that appellant caused Monica's death.

Appellant was jealous and possessive, to the degree that he would not allow Monica to go anywhere without him.  Monica's mother noticed Monica seemed scared and confused in the days leading up to her death.  When A.C. went to bed the evening before she discovered Monica's body, appellant and Monica were together.  When A.C. woke up the next morning, Monica was dead and appellant had fled without taking any of his personal belongings.  Appellant never returned to retrieve his belongings or his paycheck, and A.C. never heard from him again.  The officers who responded at the scene saw no signs of forced entry.

Although Monica suffered a violent death, the medical examiner testified that Monica would not have been able to scream while she was being strangled if constant pressure were being applied to her neck.  Thus, the jury reasonably could have inferred that A.C. did not hear a scuffle or fight because appellant applied constant pressure to Monica's neck while strangling her.

The only evidence indicating when appellant left the apartment was his statement that he left between 9:30 p.m. and 10:30 p.m. and arrived in Edinburgh around 3:00 a.m. Although appellant placed cell phone calls to his mother's telephone number just before 9:00 p.m. and again at 3:00 a.m., there is no record indicating the location from where

those calls were placed.[9]  Assuming for argument's sake the veracity of appellant's statement, Monica could have been strangled before appellant left the apartment. Appellant argues this was not possible because A.C. told police officers her mother checked on her several times, including "in the middle of the night."  At trial, however, A.C. testified that she did not check the clock when her mom came into the bedroom. The jury was free to infer that A.C., having been awakened from sleep by her mother, was confused regarding when her mother checked on her.  The jury was also free to disbelieve appellant's statement regarding when he left the apartment and when he arrived in Edinburgh.  We may not substitute our judgment for that of the jurors.  *See Brooks*, 323 S.W.3d at 901–02.

Appellant's argument regarding the lack of fingerprint evidence and police failure to secure the crime scene amounts to an attack on the weight and credibility of the evidence.  *See Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999).  Likewise, the fact that unknown DNA was found under Monica's nail relates to the weight and credibility of the evidence.  The DNA analyst testified to detect a complete DNA profile, "a substantial amount of transfer must be present" that would not be present from merely touching.  Here, the amount of DNA from the unknown contributor was not enough to obtain a complete DNA profile, indicating the transfer of DNA could have been by mere touch and did not require enough force to cause manual strangulation.  The jury was entitled to weigh this evidence in determining whether appellant perpetrated the crime, and we decline to substitute our judgment for the jury's on this issue.

### 2. Forensic Evidence of Cause of Death

Appellant argues the hydrocodone in Monica's system, as opposed to strangulation, may have caused her death.  However, the amount of evidence indicating

---

[9] Appellant argues that the police should have obtained cell tower records, which could have shown where appellant was when he made the calls.  Appellant made this argument at trial, and the jury was free to weigh this fact in its determination of whether appellant perpetrated the crime.  *See Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999) ("The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and of the strength of the evidence.").

Monica died by strangulation was overwhelming. She suffered numerous injuries to her neck, including hemorrhages, unhealed bruises and scratches, and cartilage fractures. The medical examiner testified Monica "ha[d] more fractures in her neck than I think I've seen in any other strangulation." Also, the petechial hemorrhages in Monica's eyes, on the skin around her eyes, and in the mucus membranes in her mouth showed that she died from asphyxiation as opposed to a drug overdose. The medical examiner opined that, under the circumstances, the hydrocodone did not contribute to Monica's death.[10] The jury, as the sole judge of the credibility of the evidence, was in the best position to determine the cause of Monica's death. *See Goodman v. State*, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001) ("[I]t is a jury, not a reviewing court, that accepts or rejects reasonably equal competing theories of causation.").

The jury was the sole judge of the credibility of and weight to be given to the evidence presented by the State and the fact that A.C. did not hear a struggle between appellant and Monica, appellant's statement regarding when he left the apartment, the lack of fingerprint evidence or a secure crime scene, the presence of DNA on Monica's body from an unknown contributor, and the hydrocodone in Monica's system. We defer to the jury's weight and credibility determinations and find the evidence sufficient to support the jury's verdict.

We overrule appellant's first two issues.

### *Jury Argument*

In his third issue, appellant argues he was denied due process because the State made improper jury arguments that (1) appellant recalled two witnesses to the stand, (2) appellant was guilty because he said he needed a lawyer, and (3) appellant could have subpoenaed cell phone records or his mother to present evidence that he was not in the apartment when Monica died.

---

[10] Also, vomit at the scene was not necessarily related to the drugs in Monica's system because it is possible for vomit to have left her body postmortem from gastric contents coming into her airways and out of her mouth.

To complain on appeal about an improper jury argument, a defendant must show he objected to the argument at trial and pursued his objection to an adverse ruling. *See Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993); *see also Clark v. Bres*, 217 S.W.3d 501, 509 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). A defendant pursues his objection to an adverse ruling when he requests an instruction to disregard after the court sustains his objection and, if necessary, moves for a mistrial. *Cook*, 858 S.W.2d at 473; *Clark*, 217 S.W.3d at 509. When he fails to do so, he has nothing to complain of on appeal because the court has already given him all the relief he requested at trial. *Cook*, 858 S.W.2d at 473; *Clark*, 217 S.W.3d at 509. Here, appellant objected to the following comment by the State as "shifting the burden of proof": "[Appellant] called [A.C.] back to the scene—back to the stand, and he called Detective MacGregor. Where's mama?" The trial court sustained the objection, but appellant did not pursue it to an adverse ruling. Appellant also complains that the State commented appellant "is a guilty man" because he said he needed a lawyer, but appellant did not object to this comment. Therefore, appellant waived these arguments on appeal.[11]

Appellant also complains the State shifted the burden of proof by arguing appellant could have subpoenaed his cell phone records to show where he was when he placed calls from his phone or subpoenaed his mother to testify regarding what time appellant arrived in Edinburgh. A prosecutor may comment on the defendant's failure to produce witnesses and evidence so long as the remark does not fault the defendant for exercising his right not to testify. *Jackson v. State*, 17 S.W.3d 664, 674 (Tex. Crim. App. 2000). The four areas of permissible jury argument are (1) summations of the evidence, (2) reasonable deductions from the evidence, (3) responses to the defendant's argument and (4) pleas for law enforcement. *Rocha v. State*, 16 S.W.3d 1, 21 (Tex. Crim. App. 2000). Appellant argued at trial that he could not have killed Monica because he left for Edinburgh before Monica checked on A.C. Appellant's cell phone records showed that

---

[11] When a jury argument is incurable, no objection is necessary to preserve error, but a party must include incurable jury argument as a point in a motion for new trial. *See Clark*, 217 S.W.3d at 509 & n.1 (citing Tex. R. Civ. P. 324(b)(5)). Appellant did not file a motion for new trial.

appellant called his mother twice during that night. Police officers subpoenaed, but did not receive, cell tower records for appellant's cell phone. Those records might have determined where the cell phone was when the calls were made. Appellant cross-examined the officers regarding their failure to obtain the records.[12] In closing, the State argued that appellant could have obtained the records himself or called upon his mother to testify as to the time of his arrival in Edinburgh. The State's comments were a proper response to appellant's argument. *See Jackson*, 17 S.W.3d at 674 (holding prosecutor's comments regarding defendant's failure to call defense experts challenging State's DNA evidence were rebuttal to defense counsel's argument attacking State's scientific evidence); *Corpus v. State*, 30 S.W.3d 35, 41 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (holding State made proper argument regarding defendant's failure to call material witness and noting "State may comment on [defendant's] failure to call competent and material witnesses, and may also argue that the reason for such failure is that any such testimony would be unfavorable to the accused"). The State's argument regarding appellant's failure to present evidence showing when he left the apartment and arrived in Edinburgh was not improper. We find no error. We overrule appellant's third issue.

### Batson Challenge

In his fourth issue, appellant argues the trial court erred in denying his challenge to the State's peremptory strike of a prospective juror in violation of the Fourteenth Amendment Equal Protection Clause of the United States Constitution under *Batson v. Kentucky*, 476 U.S. 79 (1986). The State argues that appellant did not establish a prima facie case of racial discrimination. We agree with the State.

Under the Fourteenth Amendment, a litigant may not exercise a peremptory challenge based on the juror's race. *Guzman v. State*, 85 S.W.3d 242, 245 (Tex. Crim. App. 2002) (citing *Batson*, 476 U.S. 79). Courts analyze all allegedly discriminatory

---

[12] Appellant also suggested in closing argument that the officer did not obtain the cell tower records because he believed appellant was telling the truth about the time of his departure for Edinburgh.

strikes according to the steps laid out in *Batson*. *Id*. at 245–46. The party opposing a particular peremptory strike first must establish a prima facie case of racial discrimination. *Id*. at 246. The burden of production then shifts to the proponent of the strike to offer a race-neutral explanation for that strike. *Id*. If the proponent offers a race-neutral explanation, the trial court must then decide whether the opponent has proved purposeful racial discrimination. *Id*. A trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008); *see also Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004).

The State is not required to give a race-neutral reason for a challenged strike unless the defendant has established a prima facie case of discrimination. *Rousseau v. State*, 824 S.W.2d 579, 581 (Tex. Crim. App. 1992). The initial burden of establishing a prima facie case is not onerous. *Id*. at 584. A defendant needs to show that (1) he is a member of a cognizable racial group, (2) the State exercised peremptory challenges to remove persons from the jury based on their race, and (3) the defendant has offered evidence of relevant facts that tend to show challenges made by the State were made for reasons based on race. Tex. Code Crim. Proc. art. 35.261(a); *see also Rousseau*, 824 S.W.2d. at 584. Although the racially discriminatory striking of even one minority juror will violate *Batson*, a defendant must prove discrimination by more than the sole fact that the minority venire-person was struck by peremptory challenge. *United States v. Branch*, 989 F.2d 752, 755 (5th Cir. 1993). Thus, when the only evidence proffered by the defendant is that a prospective juror of a cognizable racial group was struck, a prima facie *Batson* claim does not arise. *Id*. A nonexclusive list of factors that might give rise to a prima facie case includes a "pattern" of strikes, the nature of questions asked by the prosecutor during voir dire, and the prosecutor's statements during voir dire. *See id.* (citing *Batson*, 476 U.S. at 96–97); *see also Keeton v. State*, 749 S.W.2d 861, 867 (Tex. Crim. App. 1988). The court is not required to ask for and evaluate the prosecutor's

11

grounds for exercising peremptory strikes unless a prima facie case of discrimination has first been made. *Branch*, 989 F.2d at 755.

At trial, appellant challenged the State's peremptory strike of a Hispanic male prospective juror. Appellant argued only that the prospective juror "never said anything, and he was struck by the State." The State argued that appellant did not establish a prima facie case of racial discrimination, and the trial court denied the *Batson* challenge on that ground. The State did not strike four other prospective jurors who were Hispanic—three female and one male—and served on the jury. The fact that these jurors were not struck is a factor the trial court could consider in determining the State's motive. *See Jones v. State*, 845 S.W.2d 419, 422 (Tex. App.—Houston [1st Dist.] 1993, writ ref'd); *see also Roberts v. State*, 866 S.W.2d 773, 777 (Tex. App.—Houston [1st Dist.] 1993, writ ref'd). Moreover, no pattern of strikes or questions asked or statements made by the State during voir dire indicate that the strike was racially motivated. *See Bean v. State*, 816 S.W.2d 115, 119–20 (Tex. App.—Houston [14th Dist.] 1991, no writ) (holding State's use of peremptory strikes did not constitute pattern of strikes raising inference of discriminatory intent when State did not use most or all strikes to remove minority venire persons). Based on this record, we cannot say that the trial court clearly erred in finding appellant did not establish a prima facie case of racial discrimination. *See Jones*, 845 S.W.2d at 422 ("If a prosecutor takes some jurors of a particular race and rejects others, a trial judge may, in appropriate cases, infer that race was not the prosecutor's motive for the strikes, because others of the same race were accepted as jurors.").

We overrule appellant's fourth issue.

### *Conclusion*

We overrule appellant's issues on appeal. The judgment of the trial court is affirmed.


/s/      Martha Hill Jamison
Justice

Panel consists of Justices Frost, Seymore, and Jamison.

Do Not Publish — TEX. R. APP. P. 47.2(b).

12