**Affirmed and Memorandum Opinion filed January 12, 2012.**



In The

# 𝔉𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

_____

## NO. 14-10-01237-CV
_____

### KEVA TOLER LABETH AND MICHAEL LABETH, Appellants

### V.

### PASADENA BAYSHORE HOSPITAL, INC. D/B/A BAYSHORE MEDICAL CENTER, Appellee

**On Appeal from the 122nd Judicial District Court**
**Galveston County, Texas**
**Trial Court Cause No. 06-CV-0942**

## MEMORANDUM OPINION

Appellants Keva Toler LaBeth and Michael LaBeth appeal a take-nothing judgment in their suit against appellee Pasadena Bayshore Hospital, Inc. d/b/a Bayshore Medical Center. In three issues, they contend that (1) the jury arrived at a verdict in a unlawful manner, as evidenced by its unreasonably rapid deliberation; (2) the trial court erred by

admitting evidence not properly disclosed during discovery; and (3) the trial court erred by allowing defense counsel to engage in unrestrained, improper jury argument. We affirm.

## BACKGROUND

In September 2004, while working for the Hospital as a registered nurse, Keva suffered an on-the-job injury as she cared for a patient in critical condition. The patient was a quadriplegic resting on a specialized airbed. He had multiple IVs and a ventilator attached directly to his breathing canal. Keva was called to assist another nurse in cleaning and bandaging the patient. Once they rolled the patient on his side, the other nurse released him without warning and stepped away, requiring Keva to stabilize all of the patient's weight by herself. As she moved to support the patient and protect the tube entering his airway, Keva felt a large pop and experienced a sudden pain in her lower back.

Keva reported her injury to a supervisor, and the Hospital later referred her to an employee health doctor within its network. An MRI revealed that she had a herniated disk with inflammation. She was treated with medicine, physical therapy, and a series of epidural steroid injections. When her condition did not improve, Keva consulted with a neurosurgeon, who proposed a surgical fusion of the spine. With this procedure, the surgeon planned to separate Keva's spine, then take fragments of bone harvested from her hip and transplant them to her vertebrae. When the vertebrae healed, they would cause her spine to fuse back together, thereby eliminating her pain.

Although the procedure went smoothly, as Keva recovered, she detected a clear liquid leaking from her surgical incisions. Doctors found that a sharp bone fragment was puncturing the spinal canal, causing a release of cerebral spinal fluid. The condition required immediate treatment, including emergency surgery and a heavy dosage of antibiotics.

Keva recovered in the ICU for three weeks and at home for another three months. She testified that she felt well for a long time, but that her lumbar pain eventually returned.

Her leg often went numb, and she experienced shooting pains in her hip. Surgeons determined that little more could be done. Keva was prescribed pain medications and released back to work with a number of limitations. Among other medical instructions, Keva was told that she should not lift any weights heavier than twenty pounds or perform any task requiring repetitive bending or stooping. For all practical purposes, the physical restrictions prevented her from resuming her job as a nurse, and Keva was required to search for employment elsewhere.

In their live pleading, the LaBeths asserted various negligence causes of action against the Hospital. They claimed, for instance, that the Hospital was negligent in failing to provide adequate assistance for patient care. They alleged that the Hospital cut personnel for cost reasons, without regard to the needs of patients and the safety of employees. They also alleged that the airbed used by the quadriplegic required special training, which the Hospital failed to provide. Keva alleged that the Hospital's negligence in these matters proximately caused her injuries. Keva's husband, Michael, sought additional damages for loss of household services and loss of consortium.

The Hospital generally denied the allegations of negligence. In its answer, the Hospital also specifically pleaded ten additional defenses. Among its defensive theories, the Hospital alleged that (1) Keva was contributorily negligent, or her injuries were the result of an unavoidable and unforeseeable accident; (2) the LaBeths failed to mitigate their damages; (3) Keva's injuries were proximately caused by a new and independent cause; and (4) Keva's injuries were the result of a preexisting condition.

In a pretrial hearing, the LaBeths submitted a motion in limine requesting an order that the Hospital refrain from referencing any matter not properly disclosed during discovery. The LaBeths argued that the Hospital failed to respond to requests for disclosure, specifically regarding the legal theories and factual bases of the Hospital's pleaded defenses. The trial court took the issue under advisement, without making a ruling on the motion.

3

During trial, Keva testified about many of the points raised in the Hospital's defenses. On cross-examination, she specifically admitted the following:

- She decided to treat the quadriplegic with the assistance of one nurse instead of two, even though she believed that doing so was unsafe to herself and to the patient;

- The other nurse's release of the quadriplegic was unexpected;

- She waited seven days before seeking treatment for her injury, and when she finally saw her physician, she told him that she has endured "chronic back pain all the time due to the work I do";

- The MRI performed after her injury revealed a preexisting deterioration of the bones in her spine;

- Three months before the incident, she was prescribed pain medication for degenerative joint disease in her lower back;

- She missed four consecutive days of work before the incident because of back pain resulting from a motorcycle trip to Canada;

- Prior to the incident, she visited the emergency room and was prescribed pain medications after injuring her back while gardening;

- Her own medical expert agreed she had severe preexisting degenerative problems with her lower back; and

- She had been taking methadone and Vicodin every day for pain, even though a drug test taken six weeks before trial revealed neither drug in her system.

This testimony was admitted without objection. At the end of the second day of trial, following this testimony from Keva, the LaBeths' attorney reasserted his argument made at the pretrial hearing, objecting that this evidence was "not properly subjected to disclosure." The trial court ruled that "[t]hose objections have been registered since Monday when we

4

had our pretrial issues and they have continued throughout the trial." The trial court then granted the LaBeths a "running objection to all those types of exhibits, argument, cross-examination and evidence."

During closing argument, counsel for the Hospital suggested that Keva was not a credible witness. Counsel referenced moments in the record where Keva's own attorney referred to her as a "faker, a liar, [and] a drug dealer," among other terms. Defense counsel also commented on how Keva's attorney would regularly interrupt Keva on both direct and cross-examination to guide her testimony in a direction most favorable to her case. Defense counsel finally suggested that if Keva's case were truly worth the millions of dollars she sought in damages, then the jury must be prepared to explain its decision to the press should it find the Hospital liable. The LaBeths objected only to this last statement, stating that it was "awfully farfetched" and "asking the jury to consider those things that are not a part of their job here." The trial court did not overrule the objection or otherwise issue an adverse ruling, but it did remind the jury that it could consider only the evidence introduced through testimony and exhibits.

The jury returned a verdict in favor of the Hospital without having ever reviewed the trial exhibits during deliberation. On appeal, the LaBeths challenge the manner of the jury's deliberation, the admissibility of evidence concerning nondisclosed defensive theories, and the propriety of the Hospital's closing argument.

## JURY DELIBERATION

In their first issue, the LaBeths argue that the trial court erred by accepting the jury's verdict. They contend that the jury did not follow the trial court's admonitions and instructions, as evidenced by its deliberation of less than five minutes and its failure to request any of the exhibits produced at trial. These allegations of jury misconduct were raised in the LaBeths' motion for new trial, which the trial court denied.

As a reviewing court, we are ordinarily bound by the trial court's determination regarding allegations of jury misconduct, and we will only reverse such determinations upon a clear showing of an abuse of discretion. *Pharo v. Chambers Cnty.*, 922 S.W.2d 945, 948 (Tex. 1996).

The record here, as shown by the trial court's own handwritten notes, indicates that the jury deliberated for thirty-three minutes, not five. We are aware of no authority stating that this amount of time would be inadequate to consider the types of negligence issues raised in this case. The LaBeths have also failed to supply us with any authority indicating that a jury's failure to examine trial exhibits during deliberation establishes jury misconduct.

The jury observed all of the witnesses and heard all of the evidence produced at trial. The LaBeths give us no reason to question the trial court's judgment that the jury arrived at its verdict in a lawful manner. The LaBeths' first issue is overruled.

**EVIDENCE OF NONDISCLOSED DEFENSIVE THEORIES**

In their second issue, the LaBeths argue that the Hospital was required to disclose the legal and factual bases for its defense. The LaBeths contend that because the Hospital did not fully disclose all of the bases for the defensive theories asserted in its answer, the trial court erred by admitting evidence regarding those theories at trial.

The admission or exclusion of evidence rests within the sound discretion of the trial court. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). This court will reverse on an evidentiary ruling only if the trial court abused its discretion and the erroneous ruling probably caused the rendition of an improper judgment. *Chappell Hill Bank v. Smith*, 257 S.W.3d 320, 324 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

We first address what error, if any, has been preserved for appellate review. Before a party may present a complaint on appeal, the record must normally show that the complaint was made to the trial court by a timely request, objection, or motion. Tex. R.

App. P. 33.1. The LaBeths never obtained a ruling on their motion in limine, where they first raised the issue of the Hospital's failure to disclose. The LaBeths objected once towards the beginning of Keva's cross-examination, arguing that the Hospital's failure to disclose barred it from introducing a particular set of records from Keva's post-surgical visit to the emergency room. That objection was overruled. The LaBeths raised the issue of nondisclosure once again at the conclusion of Keva's testimony, when counsel asserted on the record his "ongoing carried objection." This objection, which the trial court acknowledged as a "running objection," was not made in response to any specific part of Keva's testimony.

In their briefing, the LaBeths generally complain of evidence not properly disclosed. They contend that the Hospital gave no notice regarding the basis for its defensive theories, and that they were accordingly "ambushed" at trial when the Hospital was permitted to introduce evidence supporting these theories. In this sweeping argument, the LaBeths do not specifically identify what testimony was objectionable at trial or what evidence should have been excluded. Their briefs complain of many statements made in the pretrial hearing, but that was not evidence considered by the jury. In blanket terms, the briefs also complain of evidence at trial supporting the Hospital's theory that Keva's injury was the result of a preexisting condition. However, the record citations for this evidence are not followed by any timely or specific objections. By the time an objection was finally registered on the record, the jury had already heard significant testimony pertaining to the Hospital's asserted defenses: Keva, for instance, had testified that the handling of the quadriplegic was "unexpected," that she had undergone several procedures and surgeries following her injury, and that she had already been diagnosed with a preexisting degenerative condition. To the extent this evidence relates to the LaBeths' complaint of nondisclosure, any error was waived. *See Clark v. Trailways, Inc.*, 774 S.W.2d 644, 647 (Tex. 1989) (holding that error is waived when party fails to object to offer of testimony from nondisclosed witness); *Sec. Ins. Co. v. Nasser*, 755 S.W.2d 186, 194 (Tex. App.—Houston [14th Dist.] 1988, no writ) (same); *see also Atl. Richfield Co. v. Misty*

7

*Prods., Inc.*, 820 S.W.2d 414, 421 (Tex. App.—Houston [14th Dist.] 1991, writ denied) ("To preserve complaint on appeal regarding a trial court's ruling on the admissibility of evidence, a party must make a timely objection and obtain a ruling before the testimony is offered and received. The party waives any complaint if an objection is made after admission of the evidence, or if testimony to the same effect has been previously admitted without objection." (citations omitted)).

Assuming any error was preserved, we now address the LaBeths' argument that the Hospital was required to disclose the legal and factual bases for its defensive theories.

A party may request during discovery "the legal theories and, in general, the factual bases of the responding party's claims or defenses." Tex. R. Civ. P. 194.2(c). If a party fails to make a timely discovery response, the evidence not timely disclosed may be excluded at trial unless the court finds that the failure to respond did not unfairly surprise or unfairly prejudice the other party. Tex. R. Civ. P. 193.6(a). The rules make clear, however, that when answering a request for disclosure, "the responding party need not marshal all evidence that may be offered at trial." Tex. R. Civ. P. 194.2(c). This rule is intended to require disclosure of a party's "basic assertions," not necessarily all aspects of the party's claims or defenses. Tex. R. Civ. P. 194 cmt. 2; *see Nat'l Family Care Life Ins. Co. v. Fletcher*, 57 S.W.3d 662, 669 (Tex. App.—Beaumont 2001, pet. denied) (observing that the purpose of a request for disclosure is "to obtain early disclosure of basic information," not to present all of the party's evidence in support of its defense).

Pursuant to Rule 194.2(c), the LaBeths requested disclosure of all legal theories and factual bases for the Hospital's defense. Referring back to its original answer, the Hospital responded by indicating that it was generally denying the LaBeths' allegations. Assuming, without deciding, that this disclosure response was inadequate, we cannot conclude that the trial court abused its discretion by admitting evidence of the Hospital's defensive theories. The Hospital specifically pleaded ten defenses in its answer, in addition to its general denial. Although not pleaded with great detail, these defensive theories were fully

8

developed through extensive deposition testimony several months in advance of trial. *See* Tex. R. Civ. P. 193.5 (stating that parties have a duty to supplement their discovery responses unless additional information has already been made known "in writing, on the record at a deposition, or through other discovery responses"). Nurses were deposed on matters concerning the sufficiency of the Hospital's staffing. Doctors were deposed on the issues of Keva's preexisting conditions and her alcohol and prescription drug use. Keva herself was deposed, testifying about matters such as her previous back injuries and her judgment on the day of the incident. Even if the formal disclosures were lacking, by the end of discovery, the LaBeths were fully attuned to the finer aspects of the Hospital's defensive theories. *See Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W.3d 325, 348–49 (Tex. App.—Fort Worth 2003, pet. denied) (holding that trial court did not abuse its discretion by admitting evidence, despite improper disclosure, because party knew the substance of the evidence for over a year before trial).

The record does not support the LaBeths' argument that they were ambushed or unfairly surprised in any way. Their second issue is overruled.

## JURY ARGUMENT

In their third issue, the LaBeths argue that the Hospital's closing argument was unrestrained, improper, and incurably harmful. They complain of five particular examples, which they have neatly grouped into the following four categories: (1) improper personal criticism; (2) improper intimidation; (3) improper accusation of witness manipulation; and (4) improper personal opinion of the dollar value of the case.

Complaints of improper jury argument must ordinarily be preserved by a timely objection that is overruled and by a request that the jury disregard the improper remark. *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009); *Living Ctrs. of Tex., Inc., v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008). The LaBeths objected only once during the Hospital's closing argument, but they neither obtained an adverse ruling, nor requested an instruction to disregard. In these circumstances, a party waives any complaint that a closing

9

argument was improper and curable. *Tex. Employers' Ins. Ass'n v. Haywood*, 266 S.W.2d 856, 858 (Tex. 1954). In limited situations, however, an argument may be so prejudicial that it is incurable by instruction, and a complaint may be had on appeal even if an objection was not timely made. *See* Tex. R. Civ. P. 324(b)(5); *Clark v. Bres*, 217 S.W.3d 501, 509 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Incurable jury argument is rare, existing only where the argument "was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict." *Haywood*, 266 S.W.2d at 858; *Jones v. Republic Waste Servs. of Tex., Ltd.*, 236 S.W.3d 390, 402 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). To prove that an argument was incurable, a complaining party must demonstrate that (1) an improper argument was made; (2) the argument was neither invited nor provoked; (3) the argument was not curable by instruction, a prompt withdrawal of the statement, or a reprimand by the trial court; and (4) by its very nature, degree, and extent, the argument constituted harmful error based on an examination of the entire record and its probable effect on a material finding. *Clark*, 217 S.W.3d at 509; *see Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839–40 (Tex. 1979). Stated another way, the offensive argument must be so extreme that a juror of ordinary intelligence could have agreed to a verdict contrary to what he would have decided but for such argument. *Zurita v. Lombana*, 322 S.W.3d 463, 482 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). In deciding whether an improper argument is incurable, we may also consider as proper inquiries how long the argument continued, whether it was repeated or abandoned, and whether there was cumulative error. *Clark Equip. Co. v. Pitner*, 923 S.W.2d 117, 125 (Tex. App.—Houston [14th Dist.] 1996, writ denied).

*Improper Personal Criticism*

The LaBeths first challenge defense counsel's argument regarding Keva's credibility. In his closing statement, defense counsel made the following remarks about Keva's testimony and her attorney's reaction to her treatment on cross-examination:

> Now, by the way, I've tried and I believe I've succeeded to be kind and professional and not accusatory and not use names or say anything that was ugly to or about Ms. LaBeth. I can only bring you the facts. . . .

> But as you notice, each time I point out an [inconsistency] just on the facts – I just give you the facts – you get this fairly hysterical reaction where – these are the ways that [counsel for the LaBeths] has referred to his own client: She's faker, a liar, a drug dealer. He called her a drug pusher, a cheat, a con man, a thief, a drunk, a sociopath, a psychopath, manipulative, sneaky, mentally sick. I never said any of that. I never said any of that. That's not what I'm here to tell you now. What happens sometimes, though, is if you catch a person a little off base and you ask them about the facts and you say that's funny, you told me this but now I'm learning it's a little different and the person goes, "Are you calling me a liar?"

> Okay. It's a way to sort of escalate to make it seem like you're doing the bad thing because you're pointing out their lack of credibility and so you're a name caller now. No, I'm just bringing you the facts. You guys can go back there and discuss it and put labels on it, whatever. I'll call it credibility. All right. But it's interesting the hysterical reaction that you get.

The LaBeths argue that these statements were intended to paint Keva "as being held in contempt by her own counsel, driving a wedge between the lawyer and his client."

It is well-established that counsel should refrain from using pejorative terms and inflammatory epithets. *See Sw. Greyhound Lines v. Dickson*, 236 S.W.2d 115, 118–20 (Tex. 1951); *Zurita*, 322 S.W.3d at 482. In the same way, counsel has always been entitled to argue the facts of the case, including the reasonableness of the evidence and any inferences made from the evidence. *Zurita*, 322 S.W.3d at 482–83.

11

In this case, defense counsel plainly mischaracterized opposing counsel's remarks. Many of the pejorative terms referenced back to opening statements when counsel for the LaBeths discussed the jury's ultimate question in these words:

> Now what this case is really going to be about, you're going to hear all the witnesses answer all the questions but the one real decision that you're going to be faced with at the end of this case, is Keva Toler a liar, a cheat and a fraud and if she is, send her out of here without a cent.

Later, after defense counsel had attempted to impeach Keva on her claimed addiction to pain medications, Keva's attorney asked his client if her doctor had ever "express[ed] any concern that maybe you were a drug pusher and manipulating the system." Finally, during closing argument, counsel for the LaBeths engaged in additional flights of oratory, speaking of a hypothetical case, "Now, maybe some people will fake [a claimed injury] and do that just for attention or for money but that person is a psychopath. That person is a sociopath. That person would be a thief and a fraud. That's not what we brought here."

Keva's attorney was clearly using hyperbole as a trial strategy, rather than attributing to his client any of these disparaging characteristics. We accordingly condemn defense counsel's argument stating that Keva's attorney personally "called her" all of those names as a misstatement of the record. Nevertheless, the argument, though improper, does not rise to the extreme level of being incurable. It could have been cured by instruction, but any error was waived based on the LaBeths' failure to object.

*Improper Intimidation*

In their next challenge, the LaBeths complain of a portion of the Hospital's closing statement where defense counsel questioned whether a finding of liability is supported by the evidence:

> One of things you have to find – the burden of proof, of course, is on the Plaintiff. Burden of proof that you have to be – right now because there's no more evidence. [Counsel for the LaBeths] gets to talk after I talk; so he might remind you of something that happened but he can't bring you anything that you don't know now. So, you would have to already be sitting

there convinced in your mind that the hospital had a negligent amount of staffing over there and we're going to find them to be running the hospital wrong.

I guess I would just have to challenge you to say, well, that's a pretty important conclusion for you to have as a jury and juries have power to make decisions and set precedents and, you know, we're in Galveston County now. Even though this hospital's in Harris County, we're in Galveston County because that's where this case got filed but you have a hospital here over at UTMB. So, let's just say you make a ruling that says, by golly, 26 patients and 15 nurses is insufficient. You're negligent. Or let's say you say from now on everyone who has a trach has to have three people to turn them and so you make this major change in how hospitals are supposed to handle their assignments and training.

What are you going to say your evidence is when the newspaper reporter goes, well, that's a pretty big decision. What did they show you? They must have shown you some standards that they violated nationwide.

Following the LaBeths' objection that defense counsel's argument was becoming "awfully farfetched," the trial court instructed the jury that it should only consider evidence produced at trial when reaching a verdict. The LaBeths insist that the argument was still incurable because it intimidated jurors by suggesting that they would have to defend their verdict to the press if they found the Hospital liable.

A basic aspect of closing argument is that "counsel may properly discuss the reasonableness of the evidence as well as the probative effect or lack thereof, of the evidence." *Zurita*, 322 S.W.3d at 482. We generally afford counsel wide latitude in this matter. *Id.* at 483. The record does not suggest that defense counsel was threatening or intimidating the jury; rather, the context shows that he was commenting on the state of the evidence. Indeed, following the trial court's instruction, defense counsel never returned to the issue of newspaper reporters or the concerns of the press. Instead, he resumed his argument by stating,

So, for you to rule and find liability here, the question would be asked to you, well, what would be the evidence? Was there an expert that came in and said we need – this staffing is wrong? Was there some kind of proof? Was there

13

some evidence this kind of injury is prevalent and foreseeable? You'll see that in there you have to find that it's foreseeable if this would have happened based on having happened before. Was there some evidence that it happened before? No. So, I would say they didn't carry the burden of proof.

Based on defense counsel's commenting on the state of the evidence, this argument was not improper.

*Improper Accusation of Witness Manipulation*

The LaBeths also complain of two instances in which they allege defense counsel made improper accusations of witness tampering and witness manipulation. In the first instance, defense counsel commented on the behavior of the LaBeths' own attorney when Keva took the stand:

> [Counsel for the LaBeths], when he was questioning Keva, would always say – try to interrupt her from finishing if she was going where he didn't want her to go: Keva, Keva, no, no. We've got to stay on the track, or whatever.

> Then when I was asking my questions, he would stand up and say: No, wait. Keva, what he's asking you is – you just need to answer what he's asking you and seemed to be kind of a nervousness that she needs to be controlled and we have to very easily package the information instead of just let it flow naturally.

Defense counsel's argument is supported by the record. Counsel for the LaBeths rephrased questions for Keva on direct examination, and he also interrupted during cross-examination to refocus her testimony and, as he stated himself, "calm her down."

In the second instance, defense counsel criticized the testimony of one witness designated by the LaBeths as an expert on medical damages and causation. The expert's deposition testimony revealed that the LaBeths had not supplied the expert with a complete report of Keva's injury or preexisting condition. When commenting on the cause of Keva's injuries, the expert was asked to assume that Keva had no prior symptoms of back pain.

14

The expert testified that he had not received any of the initial medical reports pertaining to Keva's injury. The expert also testified that he did know the specific details of the actual incident, admitting that he was unaware at the time of her injury as to whether the patient being treated was large or small, or standing up or lying down.

With this background, the LaBeths contend that the following statement by defense counsel amounts to an improper accusation of witness manipulation:

> There was a bit of a – I guess I will use this word, a "manipulation" of [the expert witness] to give him the wrong information, not even describe that it was a person laying down. Why do you do that? Why not just tell him what happened and see what he says. So, that was a manipulation.

The record supports defense counsel's suggestions that the expert's testimony was influenced by incomplete information. We conclude that the argument was not improper.

*Improper Personal Opinion of the Dollar Value of the Case*

In their final challenge, the LaBeths argue that defense counsel improperly injected his own opinion of the case into the record. They specifically complain of this language: "[I]n terms of the case itself if this was really a millions of dollar case, I guarantee you would have seen something different and more generous in evidence to you in terms of a medical expert that had actually been given the proper information."

As we have already indicated, counsel is given wide latitude when commenting on the state of the evidence. *Zurita*, 322 S.W.3d at 482–83. The record shows that the LaBeths were seeking millions of dollars in damages and that their own medical expert had been given incomplete information regarding a central issue in the case. We cannot say that defense counsel's closing argument was improper or so extreme that it would have persuaded a juror of ordinary intelligence to agree to a verdict he would not have otherwise accepted but for the argument.

The LaBeths' third issue is overruled.

## CONCLUSION

The judgment of the trial court is affirmed.

/s/    Adele Hedges
        Chief Justice

Panel consists of Chief Justice Hedges and Justices Boyce and Christopher.