**Opinion issued June 21, 2012**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-11-00199-CV**

————————————

**VANESSA JEFFERSON, Appellant**

**V.**

**HELEN FULLER AND ASSOCIATES HEALTH, INC., Appellees**

**On Appeal from the 281st District Court**
**Harris County, Texas**
**Trial Court Case No. 2008-35406**

## MEMORANDUM OPINION

In this personal injury suit, Vanessa Jefferson sued her employer, Associates

Health, Inc. ("Associates Health"), and her mother, Helen Fuller, for negligence

after Fuller allegedly ran over Jefferson's foot with her power wheelchair, which

caused Jefferson to fall and fracture her femur. A jury found that Associates Health and Fuller were not negligent, and the trial court rendered a take-nothing judgment against Jefferson. In five issues, Jefferson contends that (1) the trial court erroneously refused to hold an evidentiary hearing on her motion for new trial alleging juror misconduct; (2) the jury's finding that Associates Health did not negligently fail to warn her "of the hazards of her employment or supervise her activities" was against the great weight and preponderance of the evidence; (3) the jury's finding that Fuller was not negligent was against the great weight and preponderance of the evidence; (4) the trial court erroneously ordered sanctions against her counsel for "abusing the judicial process, misusing the Court's subpoena power, and invading the privacy of a former juror"; and (5) the trial court, after sanctioning her counsel, erred in failing to file separate findings of fact and conclusions of law.

We affirm.

**Background**

*A.    Trial: Negligence*

Associates Health provides non-skilled personal care services, such as bathing, meal preparation, laundry, and shopping, to clients with medical conditions. In 2004, the Texas Department of Aging and Disability Services ("DADS") and Fuller's insurance company authorized Fuller to receive non-skilled

2

personal care services in addition to skilled nursing services. Fuller, who suffered from several medical conditions, including partial paralysis, selected Associates Health as her personal care services provider. Shortly thereafter, Jefferson, Fuller's daughter, applied to work as a part-time personal care attendant ("PCA") at Associates Health and requested that she provide PCA services for her mother.

At the time Fuller contracted with Associates Health and Jefferson began working as Fuller's PCA, Fuller had a motorized wheelchair, or "power chair," that she had already been using for several months. Jefferson testified that she attended a forty-five-minute orientation session when Associates Health hired her and that no one from Associates Health gave her any orientation at Fuller's house and no one instructed her on proper use of the power chair or on what safety precautions needed to be taken with the chair. Jefferson also testified that Associates Health was aware that Fuller used the power chair on a daily basis. According to Jefferson, she told her supervisor, Patricia Broussard, that Fuller did not need to be in her power chair because sometimes she "wouldn't maneuver it right" and she would occasionally run into the walls or furniture. Jefferson worked as Fuller's PCA for three years with no incidents.

Around 9:00 a.m. on September 6, 2007, Jefferson and her daughter, Regina, were preparing to leave Fuller's house to take Fuller to the hospital to have her blood drawn. Jefferson testified that Fuller was having trouble moving her power

3

chair through the front doorway, so she walked outside and held the screen door open so the door would not hit Fuller. Jefferson stated that she stood in front of the screen door and that there was enough space on the front porch "for you to come out of the door with the chair and someone holding the door." Regina stayed behind Fuller's chair and held the front door open. As Fuller moved her power chair through the doorway, she "geared [the chair] to the right," and the right front wheel of the chair rolled over Jefferson's right foot, causing her to fall off of the wheelchair ramp into an adjacent flowerbed. Jefferson fractured her right femur as a result of this incident, and she required several surgeries to repair the fracture.

On cross-examination, Jefferson testified that she was aware that Fuller had been diagnosed with spinal stenosis, among other medical conditions, which resulted in some paralysis and which required Fuller to occasionally take Vicodin. According to Jefferson, Vicodin would affect Fuller's "mental state." She testified that her mother is not "bed bound" and that she was often in her power chair, as that was the only way for her to get around her house. She was also aware that Fuller's health issues included numbness or weakness in her right hand, which was the hand she used to control the power chair. She acknowledged that, before this incident, she had seen Fuller operate the power chair and she knew that Fuller would "sometimes run into things." When asked about Fuller's capabilities in maneuvering her power chair on the day of the accident, Jefferson stated that she

4

"just felt like [Fuller] was doing what she usually [does], trying to maneuver herself the best she can."

Lavonia Matthews and her sister Boice Haggerty, both of whom are friends of Jefferson's who witnessed the accident, testified by deposition. Matthews and Haggerty drove up to Fuller's house as Jefferson was standing outside holding the screen door. As Matthews walked up the driveway, she saw Fuller coming out of the doorway and Regina standing behind her, still inside the house. She testified,

> And [Fuller] was coming out the door, and that's when she rolled right over [Jefferson's] right foot. And I heard her holler, "You rolled over my foot." She was screaming. That's the part that I saw. And then [Jefferson] just kind of fell over toward the flower bed, screaming and in a lot of pain.

Haggerty testified similarly.

Fuller testified that she controlled her power chair by using a joystick on the right-hand arm rest. She testified that when she was leaving her house, Regina was standing behind her holding the front door open and Jefferson was outside holding the screen door open. She stated,

> And [Jefferson held] the door open and I was going on out the door and so I had taken my—I remember taking my hand off the joy stick, but I don't know how it fell on there. Some kind of way, it got on that joy stick, then [the chair] rolled over [Jefferson's] leg and broke it. But it was just an accident. I just must have reached my arm somehow because when you first—those wheelchairs, when you first get the power in them, you have to kind of take it easy.

5

When asked if she "was doing [her] best to steer the wheelchair," Fuller replied, "I [have] been using [a power chair] for quite a while, but my hand just slipped and some kind of way, my sleeve touched the joy stick and [the chair] just jumped off and jumped on ahead." On cross-examination, Fuller testified that as she moved through the doorway, her power chair "went to the right" and ran over Jefferson's foot.

The trial court also admitted deposition testimony from Fuller in which she testified that she was supposed to keep the power chair moving in a straight line, "but it just turned" and she did not "know how [she] managed to put [her] hand on [the controls], and [the chair] turned to the right." She also testified that she was talking to Regina and she "wasn't watching" when her chair rolled over Jefferson's foot. She acknowledged that she "should have been watching and looking and keep[ing the chair] straight."

Emma Smith, the administrator of Associates Health, testified that, pursuant to Associates Health's contract with DADS, it must have a registered nurse act as a supervisor for all PCAs. She acknowledged that DADS rules and regulations require Associates Health to "ensure that the attendant is properly trained and is properly supervised." She agreed that Associates Health had the responsibility to provide orientation to its PCAs and to ensure "that the attendant has knowledge to provide competent care." Smith testified that Associates Health required its

6

supervisors to conduct a supervisory visit to the patient's house at least yearly and telephone surveys every sixty days to ensure a continuing need for service and to ensure that "the attendant is adequately delivering authorized tasks." In Fuller's case, Jefferson's supervisor conducted a supervisory home visit every ninety days.

Smith testified that the Texas Board of Nursing's standards require nursing care providers to "[m]ake a reasonable effort to obtain orientation/training for competency when encountering new equipment and technology of unfamiliar care situations." Smith stated that Associates Health was not responsible for Fuller's power chair, and it did not train Jefferson in the use of the power chair, because Fuller was classified as a "bed bound" client. She acknowledged that Fuller's "care plan" with Associates Health listed a power chair as equipment present in Fuller's home, but she stated that assistance in using the power chair was not a part of Fuller's care plan. Smith testified that the only tasks included under DADS's agreement with Fuller were "bathing, dressing, grooming, routine hair and skin, cleaning, laundry, meal preparation, escort, and shopping."[1]

Smith acknowledged that Fuller's original "health assessment," completed in 2004, noted that she was using a power chair to get around her house and checked, as allowable tasks for Jefferson to perform, both "transfer" and "ambulation" "as

---

[1] Smith testified that DADS "purchase[s] certain tasks," such as bathing or shopping, for each particular client, and, based on the tasks that DADS purchases, Associates Health develops a "care plan" with the client to instruct the PCA in what tasks to perform.

needed." Smith testified that a client can be both "bed bound" and "wheelchair bound," and she noted that, because Associates Health does not provide 24-hour service, a client's family members can provide services, such as getting a client out of bed, that Associates Health does not allow in its care plan. She stated, "Now, if family members can get [Fuller] up and get her into the power chair, it's fine; but as far as Ms. Jefferson was concerned, that was not her duty." She testified that the record from Fuller's May 2007 supervisory visit lists Fuller as both "wheelchair bound" and "bed bound," allows for transfer services as needed, and states "not applicable" for walking services.

Patricia Broussard, the current director of nursing at Associates Health, testified that she conducted Jefferson's orientation, which involved watching a video, discussing Associated Health's policies and procedures, discussing the particular tasks included in Fuller's care plan, and discussing whatever material had been submitted concerning Fuller from her caseworker. Broussard testified that Associates Health conducted home visits every ninety days for the purpose of doing "any training that needed to be done or any corrective actions that needed to be done," ensuring that the PCA was competent to perform the assigned tasks, and ensuring that the client "was still certified for these services [specified in the care plan]."

8

Broussard agreed with Smith that Fuller was classified as a "bed bound" client, which meant "that she needed to be in the bed at all times for [Associates Health's] attendants." Broussard testified that when she conducted her visits, she occasionally would see Fuller out of bed, and Fuller would tell her that Jefferson or another relative had helped her into her power chair. According to Broussard, there was never a provision in Jefferson's job description that allowed her to assist Fuller in getting out of bed. She clarified that Associates Health considered Fuller bed bound, but she noted that family members could help Fuller out of bed, even during the hours that Jefferson was working as Fuller's PCA.

After a break following the testimony of two of Fuller's children who did not witness the accident, Fuller's attorney, Kenneth Chambers, informed the trial court that, during lunch that day, juror Michael Grant approached him in the courthouse cafeteria and told him that Fuller and two of her family members were sitting next to a table where several jurors were sitting and that he was concerned he and his fellow jurors "might overhear something." Chambers responded, "Thank you. I'll handle it," and he asked Fuller and her relatives to move to another table, which they did. As the jurors left the cafeteria, Grant thanked Chambers. Jefferson's counsel asked which family members were sitting with Fuller and whether Grant overheard any conversations, to which Chambers responded, "He didn't say that." The trial court commented, "Sounds like he

9

handled the situation and avoided it and did what the lawyer should do and eradicated the situation." Jefferson did not object to Grant's continued service as a juror or request that Grant, or any of the family members present, provide an account of this interaction on the record.

Question number one in the jury charge asked whether, at the time she was injured, Jefferson was acting in the scope of her employment for Associates Health, and the jury answered in the affirmative. Question number two asked, "Did Associates Health, Inc. negligently fail to warn Vanessa Jefferson as to the hazards of her employment or to supervise her activities, which proximately caused the occurrence in question?" This question included the following instruction: "You are instructed that an employer owes its employees a non-delegable duty to warn employees as to the hazards of their employment and to supervise their activities." The jury answered, "No." Question number three asked whether the negligence of either Jefferson or Fuller proximately caused the occurrence in question. The jury answered "no" for both parties. The jury did not answer question number four, concerning the percentage of negligence attributable to all three of the parties, or question number five, concerning Jefferson's damages. In the final judgment, the trial court noted that "the jury failed to find that the accident in question was caused by the negligence of either [d]efendant," and it ultimately rendered a take-nothing judgment against Jefferson.

### B. *Motion for New Trial: Sanctions*

Jefferson moved for a new trial. She argued that the jury's findings of no negligence on the part of Associates Health and Fuller were against the overwhelming weight of the evidence. She also asserted three grounds of jury misconduct concerning presiding juror Michael Grant. She first alleged that Grant concealed information during voir dire when, on his juror questionnaire and during voir dire questioning, he stated that his occupation was "financial services," when he was actually an insurance agent. Jefferson attached Grant's juror questionnaire, a Yellow Pages telephone listing, a Texas Department of Insurance "agent profile," and a Texas Department of Insurance list of appointments for various insurance companies. Jefferson also argued that Grant impermissibly "mingled" with and accepted a favor from Chambers when, during a lunch break, Grant approached Chambers to inform him that Fuller and several family members were sitting by the jurors and talking loudly and to request that Chambers ask them to move to another table. Chambers agreed to do so, and Fuller and her family members acquiesced. Finally, Jefferson argued that she "observed [Grant] in open court on several occasions talking and exchanging comments and body language with the juror next to him."

Jefferson attached three affidavits to her motion for new trial: her own, and those of two of her daughters, Regina Jefferson and Raevann Fuller, neither of

whom testified at trial. Jefferson averred that, during the trial, she observed Grant's juror information form, which listed his occupation as "financial services." She averred that after the trial had concluded, she looked in the Yellow Pages and the Texas Department of Insurance's website, and both stated that Grant owned an insurance agency. She further stated that during her testimony and the testimony of two of her siblings, she observed Grant talking to the juror next to him, rolling his eyes, and shaking his head. She provided no information concerning the contents of Grant's alleged conversation with his fellow juror. She also averred,

> On the fourth day of trial Michael Grant came up to attorney Kent Chambers in the courthouse cafeteria and talked to him because the jurors were sitting too close to my Mother, Helen Fuller, a Defendant in this case, my daughters, Regina Jefferson and Raevann Fuller, and my brother Edward Fuller and could hear them talking. I never saw Michael Grant tell this to the judge but I did see Mr. Chambers tell this to the judge in the courtroom.

Raevann Fuller averred that, while she was in the cafeteria, she was talking about her aunts and uncles who were planning to testify, and she mentioned that her uncle had come to the courthouse under the influence of drugs and was there to lie for money. When she said this, "several of the jurors looked at [her]," and one juror pointed at her. Grant then approached Chambers, who asked the group to move to another table, which they did. Regina Jefferson's affidavit was almost identical to Raevann's.

12

At the beginning of the hearing on Jefferson's motion for new trial, the trial court asked Jefferson's counsel if he wished to make argument before calling any witnesses. Jefferson argued that Grant (1) concealed his true occupation, the fact that he had been accidentally injured in the past, and the fact that he had recently had surgery in connection with this injury at Saint Luke's Episcopal Hospital, a contention that was not specifically raised in her motion for new trial; (2) talked with Fuller's counsel in violation of the trial court's instructions; and (3) "discuss[ed] the case in the presence of everyone in the courtroom with the juror next to him, [made] faces, [and] roll[ed] his eyes, in violation of this Court's order." Jefferson's counsel informed the trial court that he subpoenaed Grant to testify at the hearing and issued a subpoena duces tecum, requiring Grant to bring his financial records, including income tax returns, and medical records to the hearing and requiring the hospital's custodian of records to bring Grant's recent medical records to the hearing.

At this point, the trial court asked Jefferson's counsel what authority allowed him to subpoena and review a juror's medical records. The court stated,

> I'm concerned about the privacy rights of this particular individual who provided service to the state and the county with jury service for multiple days, and possible violations of his rights by someone subpoenaing his medical records not only for a medical records provider to appear in court but then for medical records to be divulged to someone who, without authorization, appears to have reviewed those records.

13

Regarding the cafeteria incident, the court asked Jefferson's counsel whether that incident was addressed during the trial and whether he "request[ed] any sort of instruction or follow-up with the Court." When he responded that he did not request that the court take any action, the court found that "that particular issue is waived at this point." Jefferson's counsel also informed the trial court that he did not bring Grant's behavior in the jury box to the court's attention during trial.

The trial court quashed the subpoenas of Grant and the records custodian. The court requested additional briefing from the parties regarding whether Jefferson had established a prima facie case of juror misconduct, such that she was entitled to an evidentiary hearing on her motion for new trial, and the court noted that, if it found that Jefferson had met her prima facie case, it "may accept additional testimony on issues related to the substance of the motion." The court also noted that it considered the conduct of Jefferson's counsel "outrageous and completely unwarranted" and informed the parties that it would consider whether sanctions would be appropriate.

After the parties submitted further briefing, the trial court denied Jefferson's motion for new trial without holding another hearing. The trial court also issued an order requiring Jefferson's counsel to appear at a show cause hearing to demonstrate why he should not be sanctioned, pursuant to the court's inherent

14

power to sanction and discipline attorneys, for abusing the judicial process, misusing the court's subpoena power, and invading the privacy of a former juror.

At the show cause hearing, Jefferson's counsel testified that, after the trial, he began investigating the jurors by looking at their juror questionnaires and some answers appeared "suspicious." During the course of his investigation, he discovered that Grant was a licensed insurance agent, although he had listed his occupation as "financial services" on his juror questionnaire. He testified that he called Grant "a couple of times," but Grant never returned his calls. After he moved for a new trial, he spoke with Grant twice by telephone. He characterized his conversations with Grant as "very friendly" and "amicable." During the course of the conversation, Grant confirmed that he worked as an insurance agent, that he had suffered a sports injury in college, and that he had recently had surgery to repair his old injury. Jefferson's counsel testified that he subpoenaed Grant to bring his tax returns, medical records, a copy of his office lease agreement, and his insurance license with him to the motion for new trial hearing.

At the close of the hearing, the trial court explained that it was concerned that tacit approval of this behavior would have a "negative influence" and a "chilling" effect on jurors such that potential jurors might be afraid to participate in the judicial process if they knew that they could be forced to produce financial and medical records after the conclusion of the trial. As sanctions, the court ordered

Jefferson's counsel to write a letter of apology to Grant, to be submitted to the court for approval, and to pay the costs of the show cause hearing.

**Evidentiary Hearing on Motion for New Trial**

In her first issue, Jefferson contends that the trial court erroneously refused to hold an evidentiary hearing on her motion for new trial, which was required because her motion alleged jury misconduct.

Texas Rule of Civil Procedure 327(a) provides,

> When the ground of a motion for new trial, supported by affidavit, is misconduct of the jury . . . or that a juror gave an erroneous or incorrect answer on voir dire examination, the court *shall* hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved . . . or the erroneous or incorrect answer on voir dire examination, be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.

TEX. R. CIV. P. 327(a) (emphasis added). It is reversible error for the trial court to refuse to hear testimony on a motion for new trial if "affidavits are attached to the motion showing material jury misconduct." *Roy Jones Lumber Co. v. Murphy*, 163 S.W.2d 644, 646 (Tex. 1942); *Tony's Tortilla Factory, Inc. v. First Bank*, 857 S.W.2d 580, 588 (Tex. App.—Houston [1st Dist.] 1993) ("If a party files a proper motion for new trial that is supported by sufficient affidavits alleging jury misconduct, the trial court must conduct a hearing."), *rev'd on other grounds*, 877 S.W.2d 285 (Tex. 1994); *Am. Home Assurance Co. v. Guevara*, 717 S.W.2d 381,

384 (Tex. App.—San Antonio 1986, no writ) ("The rule imposes a mandatory duty upon the trial court to receive evidence of jury misconduct *if it is properly presented*; the party asserting jury misconduct must show good faith by demonstrating that such allegation is based upon knowledge rather than hope."); *Jordan v. Ortho Pharm., Inc.*, 696 S.W.2d 228, 238 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) ("An examination of the motion and affidavits, if present, must reveal sufficient allegations of material jury misconduct setting forth specific facts concerning the act of misconduct relied upon, naming or identifying the juror or jurors who committed the misconduct, and showing that as a consequence, harm has resulted to the movant."). "The trial court must make an initial determination as to whether material misconduct occurred from the motion [for new trial] and its attachments." *Elston v. Sherman Coca-Cola & Dr. Pepper Co.*, 596 S.W.2d 215, 217 (Tex. Civ. App.—Texarkana 1980, no writ). If the supporting affidavits do not demonstrate material misconduct, the trial court need not consider evidence on the motion. *Id.*

Here, in her motion for new trial, Jefferson argued three grounds of juror misconduct: (1) Michael Grant concealed or failed to disclose that he was an insurance agent when he listed his occupation as "financial services" on his juror questionnaire; (2) Grant improperly "mingled" with Chambers, Fuller's attorney, and received a favor when he approached Chambers in the courthouse cafeteria

and informed him that Fuller and several of her relatives were sitting close to the jurors and could be talking about the case; and (3) during testimony, Grant conversed with a fellow juror, "[made] faces," and rolled his eyes. As supporting evidence, Jefferson attached her own affidavit, as well as those of Raevann Fuller and Regina Jefferson, both of whom provided information concerning the cafeteria incident. We must determine whether Jefferson's motion and the supporting affidavits demonstrate material juror misconduct

### A.      *Concealment of Occupation*

Rule 327(a) provides that a new trial may be granted on the basis that a juror gave an "erroneous or incorrect answer on voir dire examination." TEX. R. CIV. P. 327(a). "A juror can commit misconduct if he lies in voir dire about a matter on which he was clearly biased or prejudiced." *Wooten v. S. Pac. Transp. Co.*, 928 S.W.2d 76, 79 (Tex. App.—Houston [14th Dist.] 1995, no writ). For false answers to voir dire questions to entitle a party to a new trial, the concealment must be in response to a specific and direct question calling for disclosure. *Id.* To establish jury misconduct on grounds that the juror concealed information during voir dire, a party must obtain proof of concealment from a source other than jury deliberations. *Kiefer v. Cont'l Airlines, Inc.*, 10 S.W.3d 34, 40 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

18

On his juror questionnaire, Grant listed his occupation as "financial services." During voir dire, Jefferson's counsel asked Grant, "[Y]ou work for a— financial services?" Grant responded, "I'm a financial adviser." Counsel did not ask any further questions on this subject, and the voir dire record does not indicate that Grant was asked whether he was an insurance agent or involved with the insurance industry. Jefferson averred that a post-trial investigation revealed that Grant owned an insurance agency and was affiliated with several insurance companies. She argued that Grant "had a direct or indirect interest in the subject matter of this case" and concealed his true occupation.

As Fuller points out, federal statutes have defined "financial services" to include insurance. *See* 26 U.S.C. § 904(d)(2)(D)(i) ("[T]he term 'financial services income' means any income which is received or accrued by any person predominantly engaged in the active conduct of a banking, insurance, financing, or similar business . . . .") (Internal Revenue Code); 10 U.S.C. § 992(d) ("In this section, the term 'financial services' includes the following: (1) Life insurance, casualty insurance, and other insurance . . . ."). Assisting individuals in obtaining various types of insurance policies can be an integral part of financial and estate planning. Jefferson provided no argument or authority for the proposition that, because Grant has an insurance license and owns his own insurance agency, he does not also provide "financial services," and, thus, he improperly concealed

19

information when he stated his occupation as "financial services" on his voir dire questionnaire and during questioning.[2]  We therefore conclude that Jefferson's motion and affidavit fail to demonstrate that Grant committed misconduct when he stated that his occupation was "financial services."  *See Wooten*, 928 S.W.2d at 79 (noting that concealment "must be in response to a specific and direct question calling for disclosure").

### B.      *"Mingling" with Counsel*

Jefferson also contends that Grant committed misconduct when he approached Chambers in the courthouse cafeteria and informed him that Fuller and several of her family members were sitting at a table near the jurors and that he was concerned the jurors may overhear discussion of the case.  Chambers told Grant that he would handle the problem, and he asked Fuller and her family members to move to a different table, which they did.  Grant thanked Chambers as he left the cafeteria.

Chambers later brought this incident to the trial court's attention in open court, outside the presence of the jury.  Chambers stated, "I'm not aware of anything that they did overhear, just [that Grant] was concerned [the jury] might because [the family was] sitting in close proximity."  Jefferson's counsel asked

---

[2]      We note that during the show cause hearing, the trial court admitted a photograph of the sign outside of Grant's office.  The sign indicates that Grant is an insurance agent for New York Life, but it also states that he is a "Financial Services Professional."

which family members were present and whether Grant overheard any conversations, to which Chambers replied, "He didn't say that." The trial court stated, "Sounds like he handled the situation and avoided it and did what the lawyer should do and eradicated the situation." Jefferson's counsel did not make any objections at this point in time, and he did not ask to question Grant on the record regarding the incident and what he may have overheard or to question the family members on the record regarding their conversation topics.

At the motion for new trial hearing, the trial court and Jefferson's counsel had the following exchange:

The Court:   [W]e addressed that during the trial, did we not?

[Jefferson]:  Addressed what?

The Court:   The cafeteria incident. We addressed that during the trial, did we not?

[Jefferson]:  Yes, we addressed it during the trial.

The Court:   Did you request any sort of instruction or follow-up with the Court?

[Jefferson]:  I did not.

The Court:   The Court finds that particular issue is waived at this point.

We agree with the trial court that Jefferson waived any complaint of juror misconduct on this basis. The alleged misconduct occurred while the evidence was still open. Chambers informed the trial court and Jefferson's counsel of what had happened with Grant. Jefferson's counsel asked two questions about the incident,

21

but he appeared satisfied that no misconduct had occurred. He did not take the opportunity to question Grant or any of Fuller's family members on the record about the incident. He did not raise a complaint of juror misconduct until the motion for new trial. We conclude that the trial court properly determined that Jefferson had waived her complaint of juror misconduct on this basis. *See Alamo Carriage Serv., Inc. v. City of San Antonio*, 768 S.W.2d 937, 943 (Tex. App.—San Antonio 1989, no writ) ("[Plaintiffs] had three full days to voice their objections [to the alleged jury misconduct] before the verdict was returned. We believe that it would be wantonly unfair to allow a litigant to take his chances with the jury and later complain of misconduct when he is unhappy with the result. A party may not speculate on the result of a verdict and then for the first time complain of jury misconduct."); *see also Melendez v. Exxon Corp.*, 998 S.W.2d 266, 279 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding complaint that juror was sleeping during trial not preserved when raised for first time in motion for new trial).

## C.    *Juror's Behavior in Open Court*

Finally, Jefferson contends that she observed Grant "in open court on several occasions talking and exchanging comments and body language with the juror next to him." In her affidavit, Jefferson further averred, "During the trial while I was testifying and Reginald Fuller and Margaret Fuller were testifying[,] I observed

and heard Michael Grant many times talking to the juror next to him, rolling his eyes over and over and shaking his head back and forth." At the motion for new trial hearing, Jefferson's counsel argued that Grant "[w]as discussing the case in the presence of everyone in the courtroom with the juror next to him," but he conceded that Grant's behavior was not brought to the trial court's attention at the time that it occurred.

To the extent Jefferson contends that Grant and an unidentified juror improperly discussed the case in the courtroom prior to the start of deliberations, we note that Jefferson presented no admissible evidence concerning the content of Grant's alleged conversation with the other juror. In her affidavit, Jefferson merely stated that she observed and heard Grant "many times talking to the juror next to him," but she gave no indication of the contents of this alleged conversation. *See Guevara*, 717 S.W.2d at 384 ("[T]he party asserting jury misconduct must show good faith by demonstrating that such allegation *is based upon knowledge rather than hope*.") (emphasis added); *Jordan*, 696 S.W.2d at 238 ("An examination of the motion and affidavits . . . must reveal sufficient allegations of material jury misconduct setting forth specific facts concerning the act of misconduct relied upon . . . .").

Jefferson has presented no authority that one juror speaking to another about an unknown topic, rolling his eyes, and shaking his head during testimony

constitutes juror misconduct. Furthermore, as the trial court noted during the motion for new trial hearing, none of this alleged conduct was brought to the trial court's attention during the trial, even though Jefferson averred that she observed Grant's behavior during her testimony as well as during the testimony of two other witnesses. *See Melendez*, 998 S.W.2d at 279 (holding plaintiff waived complaint of juror misconduct due to juror allegedly sleeping during trial when juror's behavior not brought to attention to trial court during trial). We conclude that Jefferson's motion and affidavit do not establish that Grant engaged in misconduct on this basis.

We therefore conclude that because Jefferson's motion for new trial and the attached affidavits do not demonstrate that Grant engaged in material misconduct, the trial court did not err in refusing to hold an evidentiary hearing on the motion.

We overrule Jefferson's first issue.

### Sufficiency of the Evidence

In her second issue, Jefferson contends that the jury's finding that Associates Health did not negligently fail to comply with its non-delegable duty to warn her of the hazards of her employment or to supervise her activities was against the great weight and preponderance of the evidence. In her third issue, Jefferson contends that the jury's finding that Fuller was not negligent was also against the great weight and preponderance of the evidence.

## A.     Standard of Review

When the appellant attacks the factual sufficiency of an adverse finding on an issue on which she had the burden of proof, the appellant must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).  We consider and weigh all of the evidence and we set aside the verdict only if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust.  *Id.*; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).  The jury is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another.  *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).  We may not substitute our judgment for that of the jury.  *Id.*  "Because it is the jury's province to resolve conflicting evidence, we must assume that jurors resolved all conflicts in accordance with their verdict."  *Figueroa v. Davis*, 318 S.W.3d 53, 60 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

## B.     Finding that Associates Health Did Not Negligently Fail to Warn Jefferson or to Supervise Her Actions

To prove negligence, the plaintiff must establish a duty, a breach of that duty, and damages that are proximately caused by the breach.  *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006) (per curiam).  Liability for negligence

25

cannot be imposed if no duty exists. *Id.* An employer has a duty to use ordinary care in providing a safe workplace, which generally requires the employer to warn an employee of the hazards of employment and provide any needed safety equipment or assistance. *Id.* "However, an employer is not an insurer of its employees' safety." *Id.* An employer owes no duty to warn of hazards that are commonly known or already appreciated by the employee. *Id.*; *see also Brookshire Grocery Co. v. Goss*, 262 S.W.3d 793, 795 (Tex. 2008) (per curiam) (stating same); *Nat'l Convenience Stores, Inc. v. Matherne*, 987 S.W.2d 145, 149 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("[A]n employer's duty to instruct applies to an inexperienced employee but not to one who is experienced in the work he is assigned.").

Jefferson contends that Associates Health failed to instruct her "in the safe use of wheelchairs and power chairs" and failed to warn her of the potential hazards involved when an Associates Health client uses a power chair. At trial, Jefferson testified that she began working for Associates Health as her mother's PCA in 2004, three years before the incident at issue. She testified that Fuller had been using the particular power chair involved in the incident for several months at the time that Associate Health began providing non-skilled care and assistance to Fuller. She stated that she was aware that Fuller occasionally takes Vicodin, which has "affect[ed] her mental state" in the past, and she also testified that she had

26

witnessed Fuller run into walls and furniture with her power chair on several prior occasions.

Jefferson was injured when, while she was standing outside and holding a screen door open, Fuller's power chair ran over her right foot, causing her to fall into a flowerbed and break her femur. The danger associated with an elderly patient who takes several medications operating a motorized wheelchair and the possibility that such a patient might lose control over the chair are "danger[s] known to all," and, thus, Associates Health owed no duty to Jefferson to warn her of the potential hazard that Fuller's power chair posed to Jefferson's feet. *Elwood*, 197 S.W.3d at 795 ("Kroger had no duty to warn Elwood of a danger known to all and no obligation to provide training or equipment to dissuade an employee from using a vehicle doorjamb for leverage."); *see also Goss*, 262 S.W.3d at 795 ("But an employer owes no duty to warn of hazards commonly known or already appreciated by the employee . . . ."); *Jack in the Box, Inc. v. Skiles*, 221 S.W.3d 566, 569 (Tex. 2007) (per curiam) ("The dangers associated with the use of a ladder to climb over a lift gate are common and obvious to anyone."). Furthermore, Jefferson had witnessed Fuller lose control over her power chair on previous occasions, and, therefore, Jefferson already appreciated the hazard that Fuller might lose control and that her chair might run over Jefferson's foot. *See*

27

*Elwood*, 197 S.W.3d at 794 (holding that employer owes no duty to warn of dangers already appreciated by employee).

We hold that because Associates Health did not owe Jefferson a duty to warn her of the danger posed by holding the screen door open for Fuller while she maneuvered her power chair through the doorway, the jury's finding that Associates Health did not negligently fail to warn Jefferson of the hazards of her employment was not against the great weight and preponderance of the evidence so as to be manifestly unjust.

We overrule Jefferson's second issue.

### C.      *Finding that Fuller Was Not Negligent*

To prevail on her negligence cause of action against Fuller, Jefferson must establish the existence of a duty, a breach of that duty, and damages proximately caused by the breach. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). To establish breach of duty, the plaintiff must show either that the defendant did something an ordinarily prudent person exercising ordinary care would not have done under the particular circumstances or that the defendant failed to do something that an ordinarily prudent person would have done in the exercise of ordinary care. *Caldwell v. Curioni*, 125 S.W.3d 784, 793 (Tex. App.—Dallas 2004, pet. denied); *Lincoln Prop. Co. v. DeShazo*, 4 S.W.3d 55, 61 (Tex. App.—Fort Worth 1999, pet. denied).

In support of her contention that the jury's finding that Fuller was not negligent was against the great weight and preponderance of the evidence, Jefferson points to Fuller's admissions in her deposition testimony, made in response to the questioning of Jefferson's counsel and read into the record during trial, that she ran over Jefferson's foot with her power chair, which caused Jefferson to fall into the flowerbed, that the power chair was not defective and did not malfunction, and that she "should have been watching and looking to keep [her] power chair] straight." It is undisputed that the right front wheel of Fuller's power chair ran over Jefferson's right foot, causing Jefferson to fall and fracture her femur; however, Fuller denied that she was negligent in operating her power chair and she presented testimony to this effect at trial.

Fuller and Jefferson both testified that Fuller controlled the direction in which the power chair moved via a joystick on the right-hand arm rest. Fuller testified as follows concerning the incident:

> And [Jefferson held] the door open and I was going on out the door and so I had taken my—I remember taking my hand off the joy stick, but I don't know how it fell on there. Some kind of way, it got on that joy stick, then [the chair] rolled over [Jefferson's] leg and broke it. But it was just an accident. I just must have reached my arm somehow because when you first—those wheelchairs, when you first get the power in them, you have to kind of take it easy.

Fuller stated that she has been using a power chair "for quite a while" and that, on this occasion, her "hand just slipped and some kind of way, [her] sleeve touched

the joy stick and [the chair] just jumped off and jumped on ahead," running over Jefferson's foot in the process.

The record, therefore, contained conflicting evidence: (1) Fuller's deposition testimony that she was talking to Regina and not watching where she was going as she moved through the doorway, and (2) her trial testimony that she was trying to maneuver her power chair through the doorway when either her hand slipped off the chair's joystick or her sleeve hit the joystick and caused the chair to move to the right, instead of straight ahead, running over Jefferson's foot. We assume that the jury resolved any conflicts in the evidence in accordance with its verdict. *Figueroa*, 318 S.W.3d at 60. Thus, there was evidence in the record that Jefferson's injury was the result of an accident and not the result of Fuller's failure to use ordinary care in operating her power chair. As the fact-finder, the jury had the sole responsibility to assess the credibility of the witnesses, and it could choose to believe or disbelieve all or part of any witness's testimony. *See Jackson*, 116 S.W.3d at 761. When the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the jury. *Id.*

Based on this record, we hold that the jury's finding that Fuller was not negligent was not against the great weight and preponderance of the evidence so as to be manifestly unjust.

We overrule Jefferson's third issue.

## Sanctions Order

In her fourth issue, Jefferson contends that the trial court erred in ordering sanctions against her counsel for "abusing the judicial process, misusing the Court's subpoena power[,] and invading the privacy of a former juror." In her fifth issue, she contends that the trial court erred in failing to file separate findings of fact and conclusions of law in association with this order.

Courts possess the inherent power to discipline an attorney's behavior and may impose sanctions on their own motion in an appropriate case. *In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997) (orig. proceeding). "Even in the absence of an applicable rule or statute, courts have the authority to sanction parties for bad faith abuses if it finds that to do so will aid in the exercise of its jurisdiction, in the administration of justice, and the preservation of its independence and integrity." *Clark v. Bres*, 217 S.W.3d 501, 512 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). The trial court has the inherent power to sanction an attorney "to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the court's administration of its core functions . . . ." *Mills v. Ghilain*, 68 S.W.3d 141, 145 (Tex. App.—Corpus Christi 2001, no pet.). To uphold a sanction imposed under the court's inherent power, there "must be some support in the record that the [attorney's] conduct complained of significantly interfered with the court's legitimate exercise" of one

of its core functions.  *Id.*; *see also Kings Park Apartments, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 101 S.W.3d 525, 541 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (holding same).

We review a trial court's order sanctioning an attorney under its inherent powers for an abuse of discretion.  *See Clark*, 217 S.W.3d at 512; *Lawrence v. Kohl*, 853 S.W.2d 697, 700 (Tex. App.—Houston [1st Dist.] 1993, no writ).  In reviewing the trial court's sanctions ruling, we are not bound by the trial court's findings of fact and conclusions of law concerning the ruling.  *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (per curiam).  Instead, we independently review the entire record to determine whether the trial court abused its discretion.  *Id.*; *Lawrence*, 853 S.W.2d at 700 ("[We] must review the entire record and view the evidence most favorably to the trial court's ruling.").  Any findings of fact made by the trial court "are not to be treated on appeal as findings of fact made under Texas Rule of Civil Procedure 296, which are reviewed for legal and factual sufficiency."  *Mills*, 68 S.W.3d at 145 (citing *IKB Indus. Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 442 (Tex. 1997) and *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 852 (Tex. 1992)); *see also Clark*, 217 S.W.3d at 513 (stating same).  The trial court's findings are instead "merely utilized to assist the appellate court in deciding whether the trial court abused its discretion."  *Mills*, 68 S.W.3d at 145 (citing *IKB Indus.*, 938 S.W.2d at 442).  We must ensure

that the sanctions imposed were appropriate and just. *Jones*, 192 S.W.3d at 583 (citing *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 916 (Tex. 1991)).

Here, in her motion for new trial, Jefferson enumerated three specific allegations of juror misconduct on Grant's part: (1) he concealed his true occupation when he listed his occupation as "financial services," instead of disclosing that he had an insurance license, on his juror questionnaire; (2) he inappropriately "mingled" with and accepted a favor from Chambers when he informed Chambers that Fuller and her family members, some of whom were potential witnesses, were sitting very close to the jurors in the courthouse cafeteria and requested that Chambers ask them to move to a different table; and (3) he improperly discussed the case during trial with a fellow juror while sitting in the jury box and "[made] faces" and "roll[ed] his eyes" during testimony, in violation of trial court orders. Jefferson did not allege in her motion that Grant committed misconduct by failing to disclose that he had suffered an accidental injury and had received medical attention for this injury on his juror questionnaire, and she did not attach any evidence demonstrating this allegation to her motion for new trial in affidavit, or any other, form.[3] Jefferson's counsel did not raise this allegation until

---

[3] During voir dire, Chambers asked the venire whether they themselves or someone close to them had had a knee injury. Grant raised his hand. He then stated, "Had two, first in college, football injury, fractured my patella. It was—there was some

33

the motion for new trial hearing, after which he had already subpoenaed Grant and the records custodian of Saint Luke's Episcopal Hospital, requiring her to bring Grant's medical records to the hearing.[4]

The trial court was appropriately concerned that subjecting jurors to the subpoena power of the court and requiring them to disclose their financial and medical records might have a "chilling" effect or a negative influence on citizens' willingness to participate in the judicial process. Given that Jefferson did not argue and did not provide any evidentiary support in her motion for new trial for her contention that Grant had concealed his injury history, we cannot conclude that the trial court abused its discretion when it found that Jefferson's counsel abused the judicial process, misused the court's subpoena power, and invaded Grant's privacy. We therefore hold that the trial court's decision to sanction Jefferson's

---

negligence on the university's part but they—they took care of it all. The second, had ACL reconstruction and meniscal repair about four years ago." He told Chambers that he could be unbiased and further stated, "[S]ometimes individuals are right; sometimes they're wrong. Sometimes organizations are right; sometimes they're wrong. That's why we have laws."

[4] Jefferson argued that Grant committed misconduct on this basis in her supplemental briefing provided at the trial court's request after the motion for new trial hearing. To the extent she contends that this filing amended her initial motion to raise this allegation, we note that Rule 329b allows a party to amend a motion for new trial, provided that the amendment occurs "within thirty days after the judgment or other order complained of is signed." TEX. R. CIV. P. 329b(b). Jefferson did not file her supplemental briefing until two months after the trial court signed its final judgment.

counsel under its inherent authority to discipline an attorney's behavior was within the zone of reasonable disagreement, and we therefore uphold the sanctions order.

Jefferson contends, in her fifth issue, that the trial court erred in including findings of fact and conclusions of law in the sanctions order itself, instead of filing separate findings and conclusions pursuant to Texas Rule of Civil Procedure 296 upon her counsel's request. We first note that, on appeal of a sanctions order, we are not bound by a trial court's findings and conclusions, and, instead, we consider the entire record when determining whether the trial court abused its discretion in making the sanctions order. *Jones*, 192 S.W.3d at 583; *Mills*, 68 S.W.3d at 145. Findings of fact relating to a sanctions order "are not to be treated on appeal as findings of fact made under [Rule] 296." *Mills*, 68 S.W.3d at 145. Moreover, when a trial court sanctions a party or an attorney pursuant to Civil Practice and Remedies Code Chapter 10, the court "shall describe *in an order imposing a sanction* under this chapter the conduct the court has determined violated Section 10.001 and explain the basis for the sanction imposed." TEX. CIV. PRAC. & REM. CODE ANN. § 10.005 (Vernon 2002) (emphasis added); *Univ. of Tex. at Arlington v. Bishop*, 997 S.W.2d 350, 355–56 (Tex. App.—Fort Worth 1999, pet. denied) (noting that court did "not condone" the practice of using separate findings and conclusions to satisfy section 10.005, but holding that when findings

and conclusions provide particulars that sanctions order itself lacks, reversible error does not occur).

Jefferson cites no authority for the proposition that, when a trial court sanctions an attorney pursuant to its inherent power, it must state its findings and conclusions in a separate document, rather than in the sanctions order itself, which is the general practice for sanctions orders. Furthermore, even if the trial court should have stated separate findings and conclusions, we cannot conclude that its failure to do so in this case is reversible error because the court set out its findings and conclusions in the sanctions order. This was not a situation in which Jefferson's counsel had to guess at the reasons that the court imposed its sanctions order and therefore could not properly present his case on appeal. *See Larry F. Smith, Inc. v. The Weber Co.*, 110 S.W.3d 611, 614 (Tex. App.—Dallas 2003, pet. denied) ("The general rule is that an appellant has been harmed [by the failure to file findings and conclusions] if, under the circumstances of the case, he has to guess at the reason the trial court ruled against him."). We therefore conclude that the trial court did not reversibly err when it refused to file separate findings of fact and conclusions of law.

We overrule Jefferson's fourth and fifth issues.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.